## VANCE *v.* STATE.

### Opinion delivered March 15, 1902.

1. HOMICIDE—WORDS AS PROVOCATION.—Mere words, however abusive and violent, are not sufficient to reduce the grade of homicide from murder to manslaughter. (Page 276.)

2. EVIDENCE—ILLUSTRATION.—It was not error to permit a witness to place two bystanders so as to illustrate the relative positions and distances between the parties at the time of the shooting. (Page 279.)

3. WITNESS—IMPEACHMENT.—The deposition of a witness should not be excluded because he admits on cross-examination that he served a term in the penitentiary for grand larceny, as his conviction should be proved by the record. (Page 280.)

4. EXCLUSION OF EVIDENCE—PREJUDICE.—Where the jury found defendant guilty of murder in the first degree, the error of excluding competent and material evidence tending to reduce defendant's punishment below that of murder in the first degree cannot be treated as harmless because the statements excluded were contradicted by a number of witnesses or because the witness is shown to have been of bad character, as the weight of the evidence was for the jury to determine. (Page 282.)

5. APPEAL—MODIFICATION OF JUDGMENT.—Where defendant was convicted of murder in the first degree, and error was committed in excluding evidence which might have reduced the punishment to that of murder in the second degree, the supreme court may, in its discretion, remand the cause with directions to the trial court to sentence defendant for murder in the second degree. (Page 285.)

Appeal from Perry Circuit Court.

GEORGE M. CHAPLINE, Judge, on exchange of circuits.

Reversed.

*Pugh & Wiley,* for appellant.

The evidence will not sustain a verdict of murder in the first degree. *Cf.* 11 Ark. 455; 29 Ark. 248; 36 Ark. 221; 56 Ark. 8; 60 Ark. 564; 20 Tex. 522. As to meaning of "deliberation" required in murder in the first degree, see: 3 Kan. 450, 483; 6 Neb.

136; 23 Ind. 231, 263; 28 Ia. 522; 60 Ark. 572; 25 Tex. 33; 20
Tex. 522; 43 Tex. 322; 70 Mo. 599; 10 Yerg. 551-2; 69 Mo. 451;
15 Nev. 407; 6 Neb. 136; 3 Kan. 450, 483; 1 Whart. Crim. Law,
§ 381; 30 Tex. 466; 36 Tex. 523. If the intent is brought about
by a provocation received at the time of the act, or so recently before
as to afford no time for reflection, it is not murder in the first
degree. It is immaterial whether or not the provocation is justifi-
able. It is purely a question of the state of mind. Whart. Crim.
Law, § 379; 69 Mo. 451-2; 66 Mo. 13; 64 Mo. 192; 15 Nev. 407;
74 Mo. 222. The indictment was defective in that it did not
describe the manner of the killing. 26 Ark. 323; 27 Ark. 493;
34 Ark. 263. It was error to permit one of the state's witnesses
to illustrate the killing and the quarrel by placing the attorneys in
the relative positions of the defendant and deceased, because of the
disparity between the size of the man selected to represent the
defendant and the one who represented the deceased. 113 Ala. 70,
83-4; 1 Greenl. Ev. § 469*d*. The court erred in suppressing the
deposition of Bud Lindsey on the ground of his conviction of lar-
ceny, because there was no record of his conviction offered in evi-
dence. 58 Ark. 277. The court erred in its fourth instruction
to the jury. Whart. Crim. Ev. §§ 329-30; 59 Ark. 422, 427; 62
Ark. 478. The court erred in refusing appellant's ninth prayer
for instruction. 55 Ark. 592, 602; 49 Ark. 543; 2 Comst. 193;
9 Am. & Eng. Enc. Law, 593; Whart. Crim. Law, § 484. The
judgment is the only competent evidence of the conviction, and
none other is admissible, when objected to in time. 1 Greenl.
Ev. §§ 375, 372; 58 Ark. 277, 279; 49 Ark. 156, 158; Sand & H.
Dig., § 2959. But, had the evidence of his conviction been com-
petent, it would have gone only to the impeachment of his testi-
mony, and not to his competency as a witness. See connection in
which said section appears in Kentucky Code, from which it is
taken. Myers' Ky. Code, 170; *id.* 661. See, also 1 Greenl.
Ev. (16th Ed.), 378*a*; Appleton, Ev. c. 3; 1 Greenl. Ev.
(16th Ed.) Appendix 1. The exclusion of the deposition was
prejudicial to appellant. 1 Bish. New Crim. Proc. § 1276; Whart.
Crim. Pl. & Pr. § 802; 15 B. Mon. 539, 547; 22 Tex. 400; 2
Humph. 78, 82; 16 Ore. 419; 14 Tex. App. 388; 44 Ala. 32, 40.
It was error to refuse to charge the jury on the law of man-
slaughter. 3 Kan. 450, 485; Whart. Cr. Law, § 480; 11 Ia. 350;
28 Ia. 522, 526; 32 Ia. 581.

*George W. Murphy, Attorney General,* and *F. T. Vaughan,* for appellee.

Since the instructions of the court fully covered every phase of the case, it was not error to refuse other cumulative instructions. 35 Ark. 585; 45 Ark. 539; 13 Ark. 314. The killing having been malicious, no instruction on manslaughter was proper. 30 Ark. 340; 34 Ark. 469; 36 Ark. 242; 37 Ark. 239-254; 29 Ark. 17; 50 Ark. 506; 52 Ark. 345; 59 Ark. 431; Hughes, Crim. Proc. § 3271; 7 Am. Crim. Rep. 439-442. There is no conflict between instructions Nos. 2 and 15. Hughes, Crim. Proc. §§ 2423, 2438, 2439, 3269; 84 Ala. 485; 72 Ala. 385; 70 Ala. 33. The twenty-fourth instruction asked by appellant was properly refused. Rogers, Exp. & Opinion Ev. §§ 197-207; 21 Ark. 350-4; 50 Ark. 511-520; 29 Ark. 117; 49 Ark. 147-8; 15 Ark. 492; 23 Ark. 115-116; 37 Ark. 581-591; 34 Ark. 469; 44 Ark. 115; 34 Ark. 696; 49 Ark. 439; Hughes, Crim. Proc. § 3254; 52 Ark. 263; 54 Ark. 621; 55 *ib.* 244. Lindsey could have refused to answered the question as to his former conviction. 48 Wis. 647-655; 13 Ark. 362. When he did answer it affirmatively, such answer dispenses with record evidence. 67 Ark. 278. It is allowable on cross-examination to ask the witness concerning former convictions, without producing the record thereof. 28 S. W. 12-14; Whart. Crim. Ev. § 274; 124 Mo. 513; Abb. Trial Brief, 171, 200; 8 Enc. Pl. & Pr. 118, 119; 16 Mich. 40; 19 Mich. 170; 94 N. Y. 137-144; 95 N. Y. 541; 38 S. W. 331; Bradner, Ev. p. 21, n. 12; 18 S. W. (Ky.), 1011; 38 S. W. 331; 93 Am. Dec. 203; 59 Kan. 404; 34 Ill. App. 84; 34 S. C. 16; 12 S. E. 619; 71 Cal. 195; 107 Pa. St. 486; 5 Gray, 578; 13 N. H. 92; 74 Ia. 310. Our statute (Sand. & H. Dig., § 2959) being taken from the Kentucky statutes (Carr, Ky. Code, § 597), we are bound by the construction placed thereon by the courts of that state. 93 Ky. 78; 18 S. W. 1011. If this ruling was erroneous, it was not prejudicial, and constitutes no ground for reversal.

RIDDICK, J. The appellant, Reedy Vance, was indicted, tried and convicted of murder in the first degree for the killing of Lee Yick by shooting him with a pistol. He brings this appeal to reverse the judgment and obtain a new trial.

The circumstances of the killing were substantially as follows: Lee Yick, a Chinaman, kept a restaurant on Fifth street, in this

city.  On the 4th day of June, 1901, Vance went into this restau-
rant, and ordered a bowl of soup.  After he had eaten his soup
he started to leave the restaurant without paying the nickel he
owed for it.  Yick followed him, and asked him for the money.
Vance, who had reached the sidewalk, and was walking away,
waved his hand back at Yick, and this, it seems, made the impres-
sion on Yick that the money had been left in the restaurant.  He
thereupon stepped back into his restaurant, but returned at once
and again asked for the money, saying: "Me see no money.  Give
me my money."  Vance was some twenty feet from Yick and
still going away.  When Yick again asked him for the money, he
turned, took a step or two towards Yick, threw at him some crackers
which he had brought in his hands from the restaurant, then,
drawing a pistol from his bosom, said, "Here's your money!" and
fired.  Yick fell to the sidewalk, mortally wounded, and died about
an hour afterwards.  This seems to us to be the truth of the matter,
though there seems to be some conflict of evidence in reference
thereto, which we shall notice further along.

Counsel have discussed quite a number of questions in refer-
ence to the rulings of the presiding judge on the trial, which, under
the facts as we see them, we deem it unnecessary to determine.
To eliminate these questions, we will say that, after a careful con-
sideration of the evidence, we find nothing that would have justi-
fied the jury in acquitting Vance on account of insanity at the
time he shot Yick.  There is, it is true, evidence to show that dur-
ing several years past Vance had acted at times in a peculiar man-
ner; that he had both talked and acted in an irrational way.  But
we think it is conclusively shown that this was while he was more
or less under the influence of intoxicating liquors.  Drunkenness
is, itself, a species of insanity, and a man who had for years been
in the habit of indulging in occasional drunken sprees, who on
one or two occasions had delirium tremens, was certain to have
often spoken or acted irrationally, and more or less like an insane
man.  There is nothing strange about that.  It is what we should
expect of one who had used alcoholic drugs to that extent.  But
Vance was not suffering from delirium tremens or so much under
the influence of strong drink at the time he killed Yick as to be
unconscious of his acts or unable to control himself.  He may have
taken alcoholic drinks on that day, and may have been to some
extent under the influence thereof, but he was not even drunk,

much less in a condition to be irresponsible for his acts. This is conclusively shown, not only by the witnesses for the state, but by the testimony of Vance himself. Though the statement he gave of the tragedy was more or less favorable to himself, it agreed in many respects with the evidence on the part of the state, and shows that he had a clear recollection of the events leading up to and including the tragic act. Reading this testimony and the testimony of other witnesses concerning the conduct of Vance on that day, we entertain no doubt that Vance was sane at the time he killed Yick, and that an acquittal on that ground would have been a clear miscarriage of justice. This conclusion is also fully supported by the testimony of Dr. Illing, a medical expert, who had had exceptional opportunities for judging of Vance's condition, and whose testimony is clear and emphatic to the effect that Vance was not insane.

Again, we feel equally certain that the killing of Yick was not done in necessary self-defense. This is apparent from the testimony of Vance himself. He stated that after partaking of the soup he found that he had no money to pay for it, and started to go and get it, first explaining to the Chinaman that he would return soon and pay him. Thereupon he said that the Chinaman picked up a long knife and followed him to the door, abusing him and calling to him to give him his money. He then continues his testimony as follows: "I moved my hand at him without stopping, and told him that I would bring him his money at once. He rushed frantically back into the restaurant. I walked on down the street to get away from him, but he returned to the sidewalk in front of his door at once. I felt sure, from what had occurred in the restaurant, that he had gone inside for a better weapon. I had seen a pistol lying on the shelf behind the counter, and I thought he meant to shoot me or throw a Chinese knife at me. I saw murder in his eye. He came out with his hand under his apron, still calling angrily and threateningly at me. I felt that I could not get away without risking a bullet or a knife in my back, and so I turned and threw a few cracker crumbs, which I had brought out of the restaurant, at him in order to disconcert him and gain time to draw my gun. I immediately drew my gun, and used it with deadly effect." This is a part of the testimony of Vance, though further along he says that he acted in haste, and did not intend to take life. Now, the witnesses for the state say that when Yick

came from his restaurant the second time Vance was about twenty feet from him and walking away; that Yick stopped immediately in front of the restaurant. Neither Vance or any of his witnesses contradict this statement. No witness states that Yick followed Vance further than the front of his restaurant. He stopped there and called to Vance to give him his money, and Vance turned and shot him. The reason that he gives for doing so is, in substance, that Yick came out with his hand under his apron and called angrily and threateningly at him. "I felt," he says, "that I could not get away without risking a bullet or a knife in my back." So he turned and shot him. Now, it is very plain that Vance did not show that there was any overt act, any attempt on the part of Yick either to cut or shoot him. Yick came out with his hand under his apron, and called angrily at him, and for this reason Vance shot him. But he had no right to shoot Yick because he held his hands under his apron; and words, however violent, do not justify an assault. They are not even sufficient provocation to reduce the grade of a homicide from murder to manslaughter, and he who takes life on account of words only, however abusive and violent they may be, commits murder. *Ex parte Sloane,* 95 Ala. 22; *Allen* v. *United States,* 164 U. S. 492; 2 Bish. New Crim. Law, 704.

There can be no doubt that Vance was guilty of murder, either in the first or second degree, when we further consider the circumstances under which he killed Yick. Let us remember that Yick had no previous grudge against Vance, who was a stranger to him, and that Yick was only endeavoring to make Vance pay for the soup he had eaten. When one walks into a restaurant, orders something to eat, and then undertakes to leave without paying for it, he should expect some remonstrance on the part of the proprietor. Especially should he expect this if he is a stranger to the proprietor; for in such a case the proprietor would not know whether his promise to get the money and return and pay was the truth or only a ruse to enable him to get away without paying. This was the position of Yick. He no doubt believed that Vance was intended to cheat him out of a nickel by eating his soup and then deliberately refusing to pay for it. The amount was small, but it was justly due, and Vance could have stopped the difficulty at once by paying or securing the nickel. The deposit of most any article would have been sufficient to convince Yick that Vance

intended to pay, and would have at once terminated the matter in a peaceable way. Vance, though a stranger to Yick, was well known in the city, where he had lived for years, and was acquainted with the bystanders. If he had nothing else, he had his pistol, by a deposit of which he could easily have obtained a nickel, had he wished to settle the controversy in an amicable way. But it is evident that Vance did not care to make any concessions. Counsel for Vance say that Yick "chattered like a chimpanzee," and that his excessive jabbering angered Vance. This coincides with the statement of the officer who testified that Vance after his arrest said that the Chinaman had insulted him, and is no doubt true. Angered by the repeated demands of Yick for his money, Vance turned and shot him. The bullet struck the Chinaman in the abdomen. That Vance was perfectly conscious of what he had done is shown by the further remark he made to the officers who arrested him. He asked, they said, where the Chinaman was hit, and, on being told that they did not know, he replied: "I aimed right here, and you will find him hit right here," indicating a point on the abdomen. Vance testified that he did not remember to have made this statement, but he expressed no regret at having taken life over such a trivial matter, and, to quote his own testimony, he said, soon after the deed was committed, "I have often heard that a Chinaman would go to hell for a nickel, and now I think it is so."

It is laid down in the books, and is the language of our statute, that, to reduce an unjustifiable homicide committed by the intentional use of a deadly weapon from murder to manslaughter, there must be both provocation and passion. The killing must be done in the heat of passion under provocation apparently sufficient to make the passion irresistible. If there be passion but no provocation, or provocation but no passion, it is murder. Where the killing results from the assault made with a deadly weapon, "malice will be implied where no considerable provocation appears, or where all the circumstances manifest an abandoned and wicked disposition." Sand. & H. Dig., §§ 1656, 1642.

Now, the brutal remark above quoted, which Vance admits that he made, taken into consideration with the other testimony, makes clear the state of Vance's mind toward the Chinaman, and shows that there was here neither provocation nor passion of the kind that mitigates crime. The act was not the result of excitement stir-

red by great provocation, under which peaceable men sometimes give way and do rash deeds, and which in the judgment of the law mitigates crime.

There was little or no provocation that a peaceable man would have felt called on to resent. The crime was prompted by malicious and revengeful anger, unrestrained by slightest regard or respect for human life.

Confining ourselves to the testimony of Vance, and to so much of the testimony of the witness for the state as he does not contradict, it is still conclusively shown that he was guilty of murder. While, if we consider the testimony for the state, which is direct and positive to the fact that Yick was unarmed, that he had his hands by his side with nothing in them, was making no demonstrations toward Vance, and doing nothing except asking for his money when Vance turned, took a step or two towards him, threw some crackers in his face and, saying, "Here's your money!" shot him down without warning,—the case is made very much stronger, and shown to be an unprovoked and brutal murder. Being thus fully convinced, from his own testimony, that Vance was sane, and that he was guilty of murder either in the first or second degree, it will be unnecessary to discuss the rulings of the trial judge on the questions of insanity and manslaughter, for those matters we regard as outside of the case.

We shall therefore confine ourselves to the consideration of the exceptions to the rulings which bear on the question of murder in the first degree. The first of these is somewhat novel. It is said that the presiding judge, over the objections of the defendant, permitted Bloom Turner, a witness, to illustrate the tragedy by having one of the counsel for the state to represent Vance, while another represented Yick, the Chinaman. These two counsel for the state suiting their actions to the words of the witness, it is said that in this way a sort of dramatic representation of the tragedy was produced before the jury. Counsel for appellant say that the representation was not a fair one, and was prejudicial to Vance for the reason, among others, that in this presentation the character of Vance was assumed by one of the counsel who was a large man, while Yick was represented by a small man, thus making it appear to the jury that it was a large and powerful man assaulting and killing a small man, whereas counsel say that the truth was to the contrary, Vance being smaller that the Chinaman.

We can very easily see that a defendant might be irreparably injured by having his actions presented in that way before the jury by unfriendly actors not under oath and paid to prosecute him, and if the record fully presented a case of that kind it would certainly be a serious question as to whether it would not call for a reversal and a new trial. But, though the record is a little vague on that point, we conclude from it that the court only permitted the witness to illustrate the relative positions and the distance between the parties at the time of the shooting. We are not certain that it shows more than this, and we cannot therefore say that there was error. We however call attention to this point, for it seems to us that there is room enough for all needful display of the dramatic powers of counsel in the regular walks of the profession, and that it is unnecessary, and even unsafe, to go further, and tread more or less on the domain of the witness.

This brings us to a consideration of the exception to the action of the court in excluding the deposition of Bud Lindsey, offered by the defendant. This witness gave in his deposition a statement of the facts of the killing, which agreed in the main with the testimony of Vance. On cross-examination he admitted that he had been convicted of grand larceny, and that he had served a term in the penitentiary for that crime, and that he was, at the time the deposition was taken, confined in jail on another charge of grand larceny. The deposition was excluded on the ground that the witness was incompetent to testify for the reason that he had been convicted of grand larceny. The question presented by the exception to this ruling is whether, when it is shown by the cross-examination of a witness whose deposition is offered as evidence that he had been convicted of a crime which under our statute renders him incompetent to testify, the court can exclude the deposition on that showing, or whether the record of the conviction must be first produced. It has been twice stated by this court that, to exclude a witness on account of a conviction for infamous crime, the record of the conviction should be produced (*Southern Insurance Co.* v. *White,* 58 Ark. 277; *Scott* v. *State,* 49 Ark. 156) ; though it does not appear in either of those cases that the witness admitted his conviction on the stand, or that the court had its attention called to the statute which is relied upon by the prosecution in this case as authority for the right to prove the conviction by the testimony of the witness himself. The statute is as follows: "A

witness may be impeached by the party against whom he is pro-
duced, by contradictory evidence, by showing that he has made
statements different from his present testimony, or by evidence
that his general reputation, for truth or immorality, renders him
unworthy of belief, but not by evidence of particularly wrongful
acts, except that it may be shown by the examination of a witness,
or record of a judgment, that he has been convicted of a felony."
Sand. & H. Dig., § 2959.

Before the passage of this statute the question as to whether
it could be shown by the cross-examination of a witness on the
stand that the witness had been convicted of a crime had been much
discussed by the courts. These discussions generally arose on
attempts to impeach witnesses in that way, for the reason that in
most of the states the fact that a witness had been convicted of a
crime did not render him incompetent, but went only to his credi-
bility. To settle that question in this state, the legislature passed
this section as part of the code of practice which regulates the
examination and impeachment of witnesses. Now, it is very prob-
able that in passing this statute the legislative mind was directed
mainly to the subject of impeaching witnesses, but it seems to me
that the language is broad enough to cover any case where the con-
viction is proved for the purpose of affecting the testimony of the
witness by whom it is proved, whether the effect of the conviction
be to exclude his testimony by showing that he is incompetent,
or whether it goes only to his credibility as impeaching testimony.
As the statute by express terms permits the fact that a witness has
been convicted of a felony to be shown either by his examination
or the record, it seems to me that when that fact has been estab-
lished, whether by a record or the testimony of the witness, the
effect is the same. I see no valid reason for making a distinction
in the method of proof between the case where the conviction goes
merely to the credibility of the witness and when it renders him
incompetent, nor do I believe that there is any such distinction in
the statute. If the conviction is one that goes only to his credi-
bility, it is for the jury to consider it with his testimony, but if it
be a conviction that renders the witness incompetent, it seems to
me that it is proper for the presiding judge to exclude his testi-
mony. For this reason, if I were the sole judge of this question,
I should say that no error was committed in excluding the deposi-
tion of this witness, it being shown by his own testimony that he

had been convicted of a crime which under our statute renders him incompetent. But, after a very careful and full consideration of this question, a majority of the judges have come to a different conclusion. As one of the judges may find it convenient to give the reasons for their conclusion on this point in a separate opinion I shall not do much more than state their conclusion. In the opinion of the majority of the judges, the section above quoted has reference only to the method of impeaching witnesses. They hold therefore that when the conviction of a witness is shown by his examination only, such conviction goes only to the credibility of the witness. In order to exclude the testimony of a witness on the ground that he had been convicted of a crime, they are of the opinion that the record of his conviction must be produced, when accessible. This conclusion, they think, is supported by the cases in our own court above referred to, and by the rule as laid down in Greenleaf on Evidence, as well as by the language of the section itself.

The case of *Cash* v. *Cash*, 67 Ark. 278, is not, they think, in conflict with this conclusion, for the reason that in that case the conviction of the witness was admitted by the party to the action, and thus dispensed with further proof of that fact.

While, as before stated, I differ with the court on this question, I do so with some hesitation, for I can appreciate the force of the argument, ably presented by counsel for appellant, which has led the court to its conclusion.

Taking that conclusion as the law of this case, it follows that the circuit court erred in refusing the deposition of Lindsey; and the next question is whether the error was prejudicial to defendant. In considering that question, it must be remembered that we are not the judges of the weight of the evidence. The argument that we can treat the rejection of this deposition as harmless error because the facts stated therein favorable to the appellant were contradicted by a number of witnesses who testified for the state, or because the witness is shown to have been of bad character, is not sound, for this is an argument concerning the weight that should be given the evidence, which the defendant had the right to submit to the jury. If, when evidence for the defendant which tended to mitigate or excuse the crime is improperly rejected by the trial court, we should retry the case here on the whole evidence, and, notwithstanding the error of the trial court in excluding the

defendant's evidence, affirm the judgment when it was our opinion
that the guilt of the defendant was made out beyond a reasonable
doubt, it is plain that the right of trial by jury, guaranteed by the
constitution, would be seriously infringed, if not abrogated.   For
there could be no real trial by jury when the jury were not allowed
to hear or consider the evidence for the defendant, and on appeal
under such a practice, where the evidence was improperly rejected,
the accused would secure, not a new trial before a jury, but a retrial
before this court, which is a very different thing.   But while we
cannot, under our system of law, go into an inquiry concerning the
weight of the evidence, still the mere fact that evidence is rejected
does not justify a reversal when, admitting the evidence to be true,
and giving it the full legal effect to which it is entitled, the court
can see that it could not or should not have altered the result.
Now, looking at this deposition in that light, we can see that it
shows nothing more than the testimony of Vance shows.   This
witness does not say that he saw either a pistol or knife in the hands
of the Chinaman, but in giving his reasons for stating that the
Chinaman had a weapon he said that he could see the print of it
under his apron, but couldn't tell whether it was a pistol or knife.
We think it is plain from his own testimony that the witness saw
neither a pistol nor knife, except the one used by Vance.   But he
does say that the Chinaman cursed, talked like he was mad, ran
into the restaurant, and came back with his hand under his apron,
apparently having something in his hand about a foot long, which
witness took to be a weapon.   While this testimony does not show
anything to justify the shooting, or furnish any provocation there-
for, still it tends to support the testimony of Vance, and was legiti-
mate evidence for the jury to consider on the question whether
Vance was guilty of murder in the first degree.   The crime was not
committed in an attempt to rob or rape, or by means of poison,
or by lying in wait, so that we cannot say as a matter of law that
it was murder in the first degree.   The evidence, we think, shows
that Vance had not formed the intention to kill until Yick came
out of the restaurant the second time.   When he came out the
second time and asked for his money, Vance shot him, but this
rejected evidence tends to support the testimony of Vance that
when this was done the Chinaman was using abusive and threaten-
ing language and holding his hand under his apron apparently as
if he held a weapon.   If this testimony had been admitted, it is

possible that it would have led the jury to believe the further statement of Vance that he acted in great haste and shot with no specific intent to kill Yick, and therefore that he was not guilty of murder in the first degree, or it might have raised in their minds a reasonable doubt as to that fact, which would have led to the same result. We do not say that it would have had that effect. It is enough that the defendant had the right to present it to the jury for their decision, and that we are unable as a matter of law to say that it might not have affected the verdict of the jury to that extent.

A majority of the judges being of the opinion that the deposition of Lindsey was improperly rejected, it follows from what we have said that we are unable to say that its rejection was not prejudicial to Vance, so far as it concerned the degree of murder found by the jury, and for this reason the judgment cannot stand for murder in the first degree.

The conclusion of the court on this point is another illustration of the wisdom of the admonition to trial judges, often repeated by this court, not to reject evidence offered by a defendant on trial for a felony when there is doubt as to its competency. Under our system of law, it is often the case that the rejection of evidence offered by a defendant charged with an outrageous crime is the greatest favor the judge could grant him, for in this way, if the evidence be wrongfully rejected, he may obtain a new trial long after the commission of the crime when through public apathy or through the dispersion of the witnesses to the crime the chances for an acquittal are far more favorable.

If the deposition of Lindsey had been admitted, it is highly probable that the verdict would have been the same, and in that event the judgment, so far as we can see, would have been affirmed. By objecting to this evidence and procuring its exclusion, it looks very much as if learned counsel for the state had unwittingly conferred a favor on the defendant, for in that way they have enabled him to bring into the record a question of law which after full consideration a majority of us feel compelled to decide in his favor. We say this of course with no intention of reflecting on court or counsel in this case, for we are ourselves divided on the question as to whether the ruling of the circuit court on this point was correct, and we mention it only for the purpose of again calling the attention of trial judges to the importance of acting with due

caution in excluding material evidence offered by a defendant charged with a capital offense, unless such evidence be clearly incompetent.

Having said this much, it is proper and we are pleased to say that in our opinion the prosecution of this case has been conducted with conspicuous ability. It is too often the case that juries are inclined by their verdicts to excuse or condone crimes committed against members of an alien and inferior race. That this jury stood firm against such influences is no doubt due in a large degree to the vigor and talent with which the prosecution was conducted, and it is nothing against counsel that in the hurry of trial they erred on a close question of law.

We take this occasion also to call attention to the backward state of the law in this state in reference to the competency of witnesses convicted of felony. The statutes which render such witnesses incompetent belong to a class of antiquated laws which suppress evidence, and which the wisdom of modern ages has discredited and shown to be unreasonable and injurious. They are of the same class as the laws which formerly forbade the parties to the suit from testifying and closed the mouth of the defendant on trial for his life, and should be repealed as these laws have been repealed, for such matters should go only to the credit or impeachment of the witness—not to the exclusion of his testimony.

There is no valid reason why a person who knows anything material to the decision of a case on trial should not be permitted to tell it, whatever may be its character, the jury being allowed to weigh his testimony in connection with his character and antecedents. These statutes not only suppress evidence, but the application of them often presents difficult and doubtful questions, which, being decided in the hurry of trial, frequently result on appeal in reversals, and in this way justice is often thwarted. There are very few states that now retain such laws, and we think our legislators might well consider whether they should not be repealed in this state also.

Having reached the conclusion that the error of the circuit court above referred to was only prejudicial in so far as it may have affected the finding of murder in the first degree, we have now to consider what should be the judgment of this court. In the case of *Simpson* v. *State,* where a conviction of murder in the first degree was reversed because the evidence was not sufficient to

support it, Chief Justice Cockrill, who delivered the opinion of the court, said: "In this case the jury have found the prisoner guilty of murder; but, having found a degree of murder which the proof does not warrant, the verdict stands for the offense of murder, and fails as to the degree. It is, then, as though the jury had found him guilty of murder, but failed to assess the punishment." The court thereupon ordered that the prisoner be sentenced for murder in the second degree. Now in that case the evidence was not sufficient to sustain the finding of murder in the first degree, while here the evidence is sufficient, but the conviction as to murder in the first degree must be set aside because of the exclusion of material evidence bearing on that point. It is, then, within our discretion to reverse the judgment and remand the case for a new trial on the whole case, or, as the exclusion of the evidence referred to could have affected the degree of the murder only, we can set aside the judgment for murder in the first degree, and allow the verdict to stand for murder in the second degree. The verdict would then fail as to the degree, but stand as to the offense of murder, and the situation of the case would be the same as if the jury had found the defendant guilty of murder in the second degree, but failed to assess the punishment, and we would remand the case with an order to sentence the defendant for murder in the second degree. *Simpson* v. *State,* 56 Ark. 19; *Roult* v. *State,* 61 Ark. 594; *Ballew* v. *U. S.,* 160 U. S. 187.

As this murder was not committed by means of poison, or by lying in wait, or in the attempt to rob, or in a way so as to leave no doubt as to the degree of the crime, a majority of us feel inclined to the opinion that a judgment for murder in the second degree, with punishment assessed at something near the longest term of imprisonment allowed for such a crime, would vindicate the majesty of the law, and do almost as much towards the protection of the public against such violent outbreaks of lawlessness as the infliction of even capital punishment would do. For this reason a majority of us are inclined to the opinion that the better course now is to end the matter by remanding the case to the circuit court with an order to sentence the prisoner for murder in the second degree, and in this way avoid the trouble, expense, delay and uncertainty of another trial on the whole case. But, as counsel may have knowledge of facts which would make such a course unwise in this case, we have concluded to give them an opportunity

to be heard before entering final judgment. An order will now be entered setting aside the judgment for murder in the first degree, with leave for either side to show cause within one week why the case should not be remanded to the circuit court with an order to sentence the defendant for murder in the second degree.

[Afterwards the parties appeared by counsel, and the state asked that judgment should be rendered against the defendant for murder in the second degree, while the defendant insisted that the case should be remanded for a new trial. The court concluded for the reasons stated in the opinion that the conviction should be affirmed for murder in the second degree, and that the punishment should be assessed at twenty years' imprisonment in the penitentiary at hard labor. The case was thereupon remanded to the circuit court, with an order to give judgment against the prisoner for murder in the second degree, and as punishment therefor to sentence him to imprisonment in the state penitentiary at hard labor for a period of twenty years, commencing at the date of such judgment in the circuit court.]

BUNN, C. J., concurred: The deposition of Bud Lindsey, a witness on behalf of the defendant, was taken while he was confined in the Pulaski county jail awaiting trial on some charge disconnected from the crime involved in this case. In his deposition, and on cross-examination by the state, and in answer to a question touching the subject, he answered that he had once been convicted of grand larceny. In what court or when he did not state. On the trial of this case, the defendant offered to introduce said deposition of Bud Lindsey, but on motion of the state the same was excluded, on the ground that in it the witness had shown himself to be incompetent by admitting that he had previously been convicted of a felony and an infamous crime under the common law.

Section 2916, Sand. & H. Dig., reads as follows: "The following persons shall be incompetent to testify:

"*First.* Persons convicted of a capital offense, or of perjury, subornation of perjury, burglary, robbery, larceny, receiving stolen goods, forgery or counterfeiting, except by consent of parties."

But this statute only applies to witnesses in civil cases, the common-law rule still applying to criminal cases, except when modified or changed by subsequent statutes. A pardon by the governor removes the common-law disability, but the credibility of

such witnesses may still be affected by the conviction.  *Werner* v. *State,* 44 Ark. 122; *Ransom* v. *State,* 49 Ark. 176.

The question of the competency of a witness is one addressed to the court, and not to the jury, for it is a question of law arising upon a showing of facts.  The courts have prescribed certain rules, that is, have fixed upon certain testimony as necessary to a correct determination of the question of competency of a witness when it is called in question by the objection that he has been convicted of an infamous crime.  The record of the conviction should be produced before the court, and then such other testimony as may be necessary to identify the witness with the former conviction, and also to show that he has not been pardoned and relieved of the disabilities of such conviction.  Of course, the latter is *dehors* the record.  But all this is a matter of law for the court to determine, and the jury is not clothed with the power to exclude testimony or determine the question of the competency or incompetency of a witness.  It is unnecessary to go into the inquiry as to when the competency of a witness should be raised.  Let it suffice to say that the question should be raised before the examination in chief, if the incompetency be known to the party seeking to avail himself of it, and at least as soon as he comes to that knowledge.  All these details of procedure but go to settle the question that it is a question of law for the court, if indeed there can be any question about it.  If the record cannot be procured in proper time, not being accessible, then secondary evidence will doubtless answer the purpose.  The rule that the best evidence accessible must be produced applies to this as well as to all other cases in judicial procedure, unless where that rule is modified by statute.

Section 2959 of Sand. & H. Dig. reads as follows, to-wit: "A witness may be impeached by the party against whom he is produced, by contradictory evidence, by showing that he has made statements different from his present testimony, or by evidence that his general reputation, for truth or immorality, renders him unworthy of belief, but not by evidence of particular wrongful acts, except that it may be shown, by the examination of a witness, or record of a judgment, that he had been convicted of a felony."

The very language of this statute shows that the question of impeachment is one for the jury to determine.  Indeed, the impeachment of a witness is purely a matter of evidence always, and one therefore for the consideration of the jury, as other evidence

in the trial, and the jury are permitted to believe it or not, or as much of it as to them seems proper.

Where, however, a party is a witness for himself, and testifies to facts rendering him incompetent against his interest, the court will then, and upon that showing, hold him as a matter of law as being incompetent. It comes then in the way of an admission. This may frequently occur in civil cases, where one is bound by his admissions against interest. It is difficult to conceive of an exceptional case of the kind in criminal procedure, however, where admission and confirmation are not possessed of the same force and effect in criminal as in civil cases, and are therefore never conclusive.

The evidence adduced under the statute last quoted, regulating the procedure looking to the impeachment of witnesses, which, though found only in our civil code, may be applied to criminal cases, as it fixes a rule not materially different from the common-law rule governing the impeachment of a witness, is addressed to the jury as to the credibility of the witness. In many, and perhaps a large majority, of the states of the Union the rule of exclusion by the court—the common-law rule—has been abolished, and the question is one for the jury only, and this is just what our impeaching statute means, except that it does not repeal the rule as to exclusion for incompetency. Did we hold that the impeaching section of our statute was intended as a substitute on the subject for all former rules, in criminal as well as civil practice, then it would still follow, and with greater emphasis even, that the evidence should not have been excluded for incompetency.

Entertaining these views on the subject, I think that it was error in the trial court to exclude the deposition, as the evidence therein detailed might have affected the conclusion of the jury as to the degree of the homicide.