BOCKMAN *v.* ROREX.

4-8413

208 S. W. 2d 991

Opinion delivered February 23, 1948.

*K. T. Sutton* and *Wayne W. Owen,* for appellant.

*J. G. Burke, John I. Moore* and *G. D. Walker,* for appellee.

ED. F. MCFADDIN, Justice. This is a dispute between professional men. A lawyer sued a doctor for an attorney fee, and the doctor has appealed.

Agents of the Internal Revenue Department investigated the income tax returns of appellant, Dr. James Bockman of Helena, Arkansas, and on August 20, 1946, served notices on Dr. Bockman of additional assessments of taxes, penalties and interest for the years, and in the amounts as follows:

| | |
|---|---:|
| 1942 | $12,050.00 |
| 1943 | 17,175.00 |
| 1944 | 21,700.00 |
| 1945 | 15,375.00 |
| Total | $66,300.00 |

A tax lien notice (under § 3670, *et seq.*, of the Internal Revenue Code of the United States, 26 U. S. C. A., § 3670, *et seq.*) was placed of record in Phillips county. Dr. Bockman was given 10 days in which to pay the said amount of money, which he had in several safe deposit boxes. The investigating agents had located and counted more than this amount of money.

First, we give Dr. Bockman's version: He testified that he had already employed an attorney of Helena and an income tax expert of Memphis, Tennessee; but he felt that he needed the services of another attorney, so he went to a friend in Helena—Mr. Bealer—to get a letter of introduction to Mr. Sam Rorex, the appellee, an attorney in Little Rock. Bockman testified that he said to Bealer:

"You know the trouble, and I would like to contact Mr. Rorex."

The meeting between Bockman and Rorex—arranged pursuant to Bockman's request—was at about 9:30 a. m., August 27, 1946, at the Albert Pike Hotel in Little Rock. Bockman says that as soon as he advised Rorex the nature of the business, Rorex went to the Internal Revenue office in Little Rock, and ascertained from the officers the exact nature of the case, and returned to Bockman, who was waiting in the lobby of the hotel. We quote from Bockman's own testimony:

". . . he came back very excited . . .; and we got into his room and he said, 'Well, I am sorry, old boy, you have got two warrants for your arrest out against you and you had better get that money right up there, you had better do it immediately.'

"Q. Did he say he was unable to get it reduced? A. He said for me to put up the money, he said, 'This

is going to cost you five thousand dollars. You had better get that money. They are only giving us two hours and you had better get that money.' Q. What did you tell him when he said it was going to cost you five thousand dollars? A. I did not answer him one word."

Bockman had what he claimed to be $66,300 in currency in his automobile. He took Rorex to the office of the Internal Revenue Department in Little Rock, and asked Rorex to assist his secretary and the revenue agents in counting the money. Bockman left while the counting was in progress, but his secretary remained. Finally, it was ascertained that the necessary amount was not present, and later Bockman supplied it; and Bockman says this was the end of Rorex' services. He claimed that all he wanted Rorex to do was to obtain a reduction in the amount required to be posted; but Bockman admitted that Rorex advised him that Rorex' fee would be $5,000, and that Bockman — while he never agreed by words—did immediately avail himself of Rorex' services without objecting to the stated fee.

Now, we give Rorex' version of the transaction: He testified that he met Bockman on the morning of August 27th by previous appointment. We quote Rorex' testimony:

"He told me these agents of the Internal Revenue Office and the collector's office . . . had searched his lock boxes and found almost eighty-five thousand dollars in currency. . . . I said, 'You are faced with two charges. Did you make a proper income tax return?'; and he said, 'no.' Then I said, 'You have been charged with failing to make a proper return. Both are penitentiary offenses, but I am not trying to scare you.' He said, 'I want to employ you to represent me'; and I said, 'On both the criminal and the civil side, too?'; and he said, 'Yes'; and I said, '. . . I will have to charge you five thousand dollars to represent you', and he said, 'That is all right.'

". . . I said, 'Doctor, you had better sit here while I go over and see what kind of shape you are in. They might have a warrant for you and they might put you in

jail.' I went to the Internal Revenue Department and Mr. Thompson was not in and I talked to Mr. Hurley, the field agent. They had an information on the desk and an information for his arrest; and I made the best speech I could for the man about his arrest; and I got Mr. Emory and Mr. Culpepper and Mr. Gooch (who succeeded me). I got an agreement that if it was satisfactory with the Treasury Department, there wouldn't be any prosecution. I went back and told Doctor Bockman what the understanding was; that they wanted the money and that he was about to be arrested; that I had been advised that I had to have the money in there by 11 o'clock. It was 20 or 30 minutes to 11 then. I told Doctor Bockman, and he said it was satisfactory. . . . We went out and got in the car and went to the collector's office. . . . This money was in one's, five's, ten's and twenty dollar bills in paper sacks. We spread it out on the tables and Doctor Bockman and I stood by and watched them count it. . . ."

Rorex continued:

". . . We started before noon, and along about 4 o'clock Doctor Bockman said he had to come back to Helena. . . . and he sent for some lady over in town and she came and stood by and helped count the money. . . . When they finished the counting, . . . there was about seventeen thousand dollars short.

• • • • • •

"Q. What effect did that have on the settlement you had made? A. They blew up, and I tried to get Doctor Bockman on the telephone. He wouldn't answer the phone, and I had to call Bealer; and he called, and talked to his secretary, and told her they had better get that money over there. Q. Then what happened? A. I asked them to give me until Thursday to get the money over there, and Doctor Bockman's secretary came over. Q. Did she ever come to see you? A. No, sir, she never did. Q. Did you obtain a release of the lien? A. Yes, sir, this lien was to be released when this money was paid in. It was released: not only sent to the court house here for the release, but it was sent to Little Rock, . . .

Q. What remained to be done after the money was paid in? A. Nothing in the world except for the Internal Revenue agents to tell Doctor Bockman how much they were going to pay him back.''

We do not lengthen the opinion by further detailing of the testimony. The evidence is voluminous. Many witnesses testified. When Bockman paid the $66,300, and received a release of lien and a feeling of security from criminal prosecution, he refused to pay Rorex the $5,000 fee or to cooperate or correspond with him in any way. Thereupon Rorex filed this action against Bockman for the $5,000 fee. The case was tried to a jury, and resulted in a verdict and judgment for Rorex for $5,000, and this appeal is an effort to reverse that judgment. Appellant urges six contentions for reversal. These, summarized, relate to (a) instructions as to the amount of recovery, and (b) the court permitting the plaintiff's attorneys to cross-examine Dr. Bockman as to having been previously convicted of misdemeanors. We discuss these points.

I. *Instructions as to the Amount of the Recovery.* The trial court told the jury in plaintiff's instruction No. 1:

''If you find from a preponderance of the evidence that the defendant entered into a contract of employment with the plaintiff and agreed to pay a fee of $5,000, and that after such employment had been partially performed, then the defendant failed to permit the plaintiff to fulfill the balance of the contract to be performed, and that the plaintiff was willing and able and attempted to fulfill such employment but was precluded from doing so by the defendant, then in that event your verdict will be for the plaintiff for the amount of the contract, or $5,000.

''You are instructed that if you find from a preponderance of evidence that Dr. Bockman employed Mr. Rorex to render legal service and agreed to pay a fee of $5,000, and that Mr. Rorex was at all times ready, willing and able to render the agreed services, then it would be no defense that Dr. Bockman may have employed others

to render the same services, and your verdict will be for the plaintiff for $5,000.''

To this instruction the defendant offered the following objection:

''The defendant objects to plaintiff's instruction No. 1 because under the instruction the only verdict the jury could return, if they should return a verdict for the plaintiff, would be for $5,000, and no other amount, and if they should find that the plaintiff performed some service for the defendant, but not all of the services required in the alleged contract, then the plaintiff would not be entitled to a verdict for the full amount of $5,000.''

In the excellent briefs filed by both sides, there is ably argued the question of whether the amount of the fee should have been left to the jury to be fixed. Without reviewing all of the cases cited, we think the entire issue here is settled by our holding in *Brodie* v. *Watkins*, 33 Ark. 545, 34 Am. Rep. 49, which is our leading case on attorney's fee in a situation where the client refuses to permit the attorney to perform. In that case Mr. Justice EAKIN stated—in language which had become classic—the law concerning attorney fees. There, Watkins had retained Turner as his attorney, to prosecute an action under a contract whereby the attorney was to have 10% of the recovery. Watkins later employed other attorneys, and summarily discharged Turner, who, at all times, was ready, able and willing to complete the contract. The other attorneys recovered $10,000 for Watkins, and Turner asked $1,000 as the 10% fee to him under the contract which he claimed Watkins had breached.

In holding that Turner was entitled to a fee, Mr. Justice EAKIN said:

''. . . in cases of special contracts for legal services, which are wrongfully prevented by the client, and where the attorney holds himself continually ready to serve, the latter may claim the whole compensation, subject to such abatement as would, in the natural course of things have been incurred if the services had been continued. The value of the legal services proper, will

not be apportioned; but whilst, upon the one hand, the attorney will not be put upon the *quantum meruit*, he ought not to recover more than he would have made if he had gone on with the case. His *time*, however, does not belong wholly to his client, and no deduction can, in ordinary cases, be justly made on the presumption that it was wholly occupied in other professional business.''

· It was shown that Turner, in order to prosecute the litigation, would have been obliged to attend court at Pine Bluff, and that his actual expenses of about $200 had been saved by reason of the breach of the contract: so, he was allowed to recover $800, which was the full amount net that he would have recovered if Watkins had not breached the contract.

In the case at bar there is no showing that Rorex would have been put to any definite amount of expense in completing the contract with Bockman. The record shows that Rorex lives in Little Rock, and that the Internal Revenue office is in Little Rock, so there would have been no traveling expenses. Appellant offered no evidence as to any amount of expenses that Rorex would have been obliged to expend in fulfilling all of his obligations under the contract. Furthermore, in objecting to instruction No. 1, the appellant did not raise the issue of the matter of expenses. We have previously copied in full his objection. So the ''expense matter'' necessarily passes out of consideration.

There is left, then, the appellant's objection that Rorex ''did not perform all the services''; so should not have full recovery. But Rorex performed all that Bockman would allow him to perform, and stood ready to perform all other services; and such services accomplished by Rorex were sufficient to keep Bockman from being arrested. We think Mr. Justice EAKIN covered this point in *Brodie* v. *Watkins, supra,* when he said:

''Legal services . . . cannot be apportioned either by time, or the amount of physical labor expended in drawing papers, attending courts, and oral arguments. It is the attorney's judgment, his learning, his responsibility and advice, which is relied upon, and which gives

the peculiar value to legal services. Perhaps the most difficult and valuable services of the attorney may be rendered in considering his client's case, and giving him confidential information, before any visible act is done. These are general considerations, to show that the professional services of an attorney cannot justly be apportioned by the plain and obvious mode indicated above for cases of other classes.''

To the same effect, see, also, *Files* v. *Fuller,* 44 Ark. 273; and *Weil* v. *Fineran,* 78 Ark. 87, 93 S. W. 568.*

Therefore, as against the objection offered to it, we conclude that plaintiff's instruction No. 1 was correct; and this conclusion disposes of appellant's objections as to all the other instructions relating to the amount of the recovery.

II. *Bockman's Previous Convictions for Misdemeanors.* Bockman was a witness in his own behalf; and on cross-examination he was asked about having been previously convicted of some offenses. The plaintiff sought to introduce in evidence duly certified copies of the judgments of the Court of Special Sessions in New York City showing: (1) that Dr. Bockman was convicted on September 3, 1930, of the offense of ''unlawful practice of medicine,'' and was sentenced to three months in the workhouse; (2) that Dr. Bockman was convicted on July 1, 1931, of the offense of ''unlawful practice of medicine,'' and was sentenced to four months in the workhouse; and (3) that Dr. Bockman was convicted on September 8, 1936, (on a plea of ''guilty'') of the offense of ''making false statements to obtain benefits under Workmen's Compensation Law,'' and was sentenced to six months in the workhouse.

---

* The following text in *Weil* v. *Fineran* (p. 92 of the Arkansas Report) is expressly approved as correct: "No error in the court's rulings is presented by assignments of error 1, 2, 3, 4 and 5 of the motion for new trial. We find no error in the giving of the instructions numbered 2, 3, 4 and 5. The instructions properly presented the law applicable to the issue and the facts in evidence. The court erred, however, in giving instruction No. 6 as to measure of damages. *Brodie* v. *Watkins,* 33 Ark. 545, 34 Am. Rep. 49. See, also, *Van Winkle* v. *Satterfield,* 58 Ark. 617, 25 S. W. 1113, 23 L. R. A. 853, on the issue of the breach of contract and the measure of damages therefor. See *Brodie* v. *Watkins, supra,* and *Davis* v. *Webber,* 66 Ark. 190, and *Thweatt* v. *Freeman,* 63 Ark. 575, 84 S. W. 720, on the question of the duty of good faith from the attorney to his client."

The plaintiff insisted below and insists here that these records were admissible in evidence as going to impeach the credibility of the witness; and in support of such position, cites § 5155, Pope's Digest. The defendant insisted below—and insists here—that these records were not admissible since they related only to misdemeanors, as distinguished from felonies; and in support of such position, cites § 5197, Pope's Digest. A very interesting question is thus posed, as to the effect of § 5155, Pope's Digest, (Act 222 of 1913) on § 5197 (Act 52 of 1905 and § 654 of the Civil Code). We are cited to no Arkansas cases which have discussed this question; and it is unnecessary for us to discuss it here, because the record reflects that the trial court, after first admitting the certified copies, later ruled them inadmissible. This appears in the record:

"The Court: Are they felony convictions? Mr. Walker: No, sir, they are convictions on a misdemeanor on appeal. The Court: Any records of convictions of misdemeanor will not be allowed to be introduced. Mr. Walker: I offer these in evidence. The Court: The Court holds they are not admissible. Mr. Walker: Note our exceptions."

The record thus affirmatively shows that the trial court excluded from the consideration of the jury all of the records of conviction; so, at all events, appellant was not prejudiced.

The trial court, however, did permit the plaintiff's attorneys to cross-examine Dr. Bockman as to whether he had ever been convicted of misdemeanors, and he admitted that he had been convicted twice. There was no error in this cross-examination, since the trial court—without objection on the part of the defendant—correctly limited the effect of the cross-examination in these words:

"Some evidence has been introduced as to the conviction of the defendant on various charges. You are instructed that this testimony goes only to the credibility of the defendant as a witness in his own behalf and is not to be considered by you in any manner as to the merits of the case."

In *Benson* v. *State*, 103 Ark. 87, 145 S. W. 883, Mr. Justice FRAUENTHAL, speaking for this court, said:

"The defendant was introduced as a witness in his own behalf, and upon his cross-examination he was asked if he had pleaded guilty to the crime of petit larceny and had been adjudged guilty of that offense. He testified that he had pleaded guilty and been adjudged guilty of that crime. . . . When a defendant in a criminal case becomes a witness in his own behalf, he is subject to impeachment like any other witness. The testimony which he gives may be discredited in the same manner that this may be done in the case of any other witness. Upon his cross-examination, therefore, he may be questioned relative to specific acts for the purpose of discrediting his testimony, and he may be asked as to whether or not he has suffered a former conviction for some crime affecting his credibility. When a defendant is a witness in his own behalf, the purpose of such testimony is only to impair his credibility and not to exclude him as a witness, and such conviction may be shown, therefore, by his own cross-examination and need not be shown by the record of the judgment."

In *Hunt* v. *State*, 114 Ark. 239, 169 S. W. 773, L. R. A. 1915B, 131, Ann. Cas. 1916D, 533, Chief Justice McCulloch said:

"On the contrary, it has been held that the defendant in a criminal prosecution, when he takes the witness stand, places himself in the attitude of any other witness, and that he may be interrogated concerning specific acts of his own for the purpose of testing his credibility. *Hollingsworth* v. *State*, 53 Ark. 387, 14 S. W. 41. He cannot be asked about a mere accusation or indictment (*Benton* v. *State*, 78 Ark. 284, 94 S. W. 688, but for the purpose of testing his credibility, he may be asked about a judgment of conviction. *Vance* v. *State*, 70 Ark. 272, 68 S. W. 37. Such matters are collateral to the issue and affect only the credibility of the accused as a witness, but are nevertheless competent for that purpose."

In *Kennedy* v. *Quinn*, 166 Ark. 509, 266 S. W. 462, we recognized the above-quoted rule as applicable also

to the cross-examination of witnesses in civil cases. There-fore, the trial court was correct in allowing Dr. Bockman to be cross-examined as to his admitted convictions.

*Conclusion*: Finding no error, the judgment of the circuit court is in all things affirmed.