679 A.2d 1188

ERNEST ALLEN COHEN, PLAINTIFF–APPELLANT AND CROSS–RESPONDENT, v. RADIO–ELECTRONICS OFFICERS UNION, DISTRICT 3, NMEBA, DEFENDANT–RESPONDENT AND CROSS–APPELLANT.

Argued September 12, 1995—Decided August 14, 1996.

142

144

*Samuel N. Reiken* argued the cause for appellant and cross-respondent (*Lillick & Charles*, attorneys; *Mr. Reiken* and *Linda P. Torres*, on the briefs).

*Ira R. Mitzner*, a member of the District of Columbia bar, argued the cause for respondent and cross-appellant (*Zazzali, Zazzali, Fagella & Nowak*, attorneys; *Mitzner, Kenneth I. Nowak* and *James R. Zazzali* on the briefs).

*Harold A. Sherman*, President, submitted a letter brief on behalf of *amicus curiae* New Jersey State Bar Association.

*Richard K. Jeydel*, President–Elect, submitted a letter brief on behalf of *amicus curiae* New Jersey Corporate Counsel Association.

The opinion of the court was delivered by

POLLOCK, J.

At issue is the enforceability of a one-year automatically-renewable retainer agreement providing for six months notice to the

lawyer before the client could terminate the agreement. The issue arises in the context of a negotiated agreement in which the lawyer and the client's representative, each a skilled negotiator, bargained for the notice of termination in exchange for a reduced fee and the attorney's availability on demand.

On April 28, 1987, plaintiff, Ernest Allen Cohen, entered into an annual retainer agreement (the Agreement) with defendant, the Radio–Electronics Officers Union District 3 (NMEBA AFL–CIO) (the ROU), to provide up to 1,000 hours of legal work in 1988 for the set fee of $100,000, to be paid in monthly installments of $8,333.33. The Agreement would automatically renew unless either party gave "written notice of termination on a date in any year not less than six (6) months nor more than seven (7) months after the commencement anniversary date of this agreement."

The ROU discharged Cohen on December 28, 1989, three days before the renewal date. Cohen claims that the ROU violated the notice-of-termination provision of the Agreement and that it owes him the full $100,000 fee for 1990. The ROU contends that the Agreement unreasonably burdens its right to discharge Cohen at will and that it does not owe him anything.

The Law Division found that the Agreement was reasonable and enforceable. In three separate opinions, a divided Appellate Division panel reversed and remanded, holding that the lengthy notice-of-termination provision unreasonably burdened the client's right to choose its lawyer. 275 *N.J.Super.* 241, 261–62, 645 *A.*2d 1248 (1994). Cohen appeals as of right on the issue of the validity of the contract and the allowed damages. *R.* 2:2–1(a). The ROU cross-appeals on the issue of setoff. We modify and affirm the judgment of the Appellate Division.

I

Cohen is an attorney admitted to practice law in Arizona, New York, and New Jersey. He specializes in labor and employment

law. From 1964 until December 1987, Cohen was a partner at a New York law firm, Marchi, Jaffe, Cohen, Crystal, Rosner & Katz (the Marchi firm). In December 1987, Cohen became of counsel to the firm.

The ROU is a labor organization of approximately 200 members that represents radio officers responsible for communications on seagoing ocean vessels. It moved from Jersey City, New Jersey, to Panama City Beach, Florida, in 1987.

From 1975 to 1980, the Marchi firm served as general counsel for the ROU. Cohen was the partner in charge of the work. His hourly rate for the ROU was $150.

Underlying the current dispute between Cohen and the ROU is a rift between competing factions in the union, each of which sought to appoint the ROU's counsel. In 1980, the ROU sustained a change in leadership. The new leaders discharged the Marchi firm and retained the law firm of Dickstein, Shapiro & Morin (the Dickstein firm), which represents the ROU in this action.

After his election as secretary-treasurer of the ROU, Thomas C. Harper asked Cohen in December 1985 to return as general counsel. On January 4, 1986, the ROU and the Marchi firm agreed on an hourly rate that would not exceed $150. According to Cohen, however, he and Harper agreed that the rate would increase gradually until it reached Cohen's standard rate of $225 per hour. In June 1986, after Harper became President of the ROU, the Marchi firm continued as general counsel with Cohen as the partner in charge.

In March 1987, Cohen decided to move to Arizona in January 1988. He planned to remain of-counsel with the Marchi firm, to practice as a solo practitioner in Arizona, and to teach as an adjunct professor at the University of Arizona College of Law.

On April 27, 1987, Cohen met with Harper to discuss his plans. At trial, Cohen and Harper gave different accounts of the meeting. According to Cohen, Harper suggested that Cohen after moving to Arizona continue as general counsel. Cohen characterized Harper

as "an extremely accomplished and successful negotiator," who bargained hard about specific provisions of the contract. In particular, Harper and Cohen negotiated a reduction in Cohen's hourly rate from $150 to $100 in exchange for six months' notification of termination of the Agreement.

Cohen explained to Harper why he needed a lengthy notice-of-termination provision in the Agreement. As a solo practitioner, he would need time to obtain new clients, if the ROU discharged him. The University of Arizona, moreover, needed to know in June, if Cohen was to become a full-time faculty member the following year. As the trial court found, "teaching or representing the ROU were the two options being considered by Cohen, and they were mutually exclusive." Thus, an independent economic reason underlay Cohen's request for a provision requiring either party to give notice of termination in June. Harper's response, according to Cohen, was "If you want a long notice provision from me, you're going to have to pay for it."

By the end of the meeting, Cohen and Harper agreed on the basics of a contract designating Cohen as General Counsel. At Harper's insistence, Cohen drafted a proposed contract for Harper to present the next day to the ROU's District Executive Committee (DEC), the governing body of the ROU. Finally, Cohen testified that he advised Harper to consult independent counsel on the proposed contract.

Harper's version differed considerably. According to Harper, Cohen "almost begg[ed]" to continue as general counsel after his move to Arizona. Cohen presented Harper with several ideas "how it could be made to ROU's advantage to have it work, including the reduced rate." Harper denied that the parties discussed any specific contract provisions and that Cohen advised him to seek independent legal advice. He claimed that Cohen, without any instruction from Harper, drafted the proposed contract and insisted that Harper sign it the following day.

On April 28, 1987, Harper, acting on behalf of the ROU, signed the Agreement naming Cohen as general counsel. Later, in April

or May, 1987, the DEC signed the Agreement after Harper made minor handwritten changes.

The Agreement, which was renewable, retained Cohen as the ROU's general counsel for one year, effective January 1, 1988. According to its terms, the Agreement was "negotiated and executed in New Jersey with reference to New Jersey law." The parties agree that New Jersey law governs this dispute.

The Agreement provided for "annual compensation of $100,000 for 1,000 hours of service," to be paid at a monthly rate of $8,333.33. It also provided for a rate of $150 for each hour in excess of 1,000 hours. According to Cohen, he was to receive the $100,000 even if he worked less than 1,000 hours.

In addition, the ROU would "seek to have Cohen designated Co-counsel to all applicable ROU related Plans and Trusts" (the ROU Plans and Trusts) and that "[w]hatever compensation Cohen receives from such Plans or Trusts will entitle ROU to additional hours of services at the rate of (1) hour per $100 of compensation."

The ROU Plans and Trusts, which are entities separate from the ROU, provide various benefits to ROU members and company employees. The ROU and employers of the ROU's members jointly fund the ROU Plans and Trusts. Each plan or trust has two attorneys acting as counsel. The ROU recommends one attorney and the employer, the other. Although the trustees of the individual plans formally select counsel, they usually follow recommendations of the ROU and the employers.

Under the Agreement, Cohen was to be "available during ROU's regular business hours for consultation by phone within 24 hours of any call from ROU to Cohen." If the ROU considered the call to be an emergency, Cohen had to be "available during regular business hours within three hours." If Cohen was "unavailable due to illness, vacation or other legitimate cause," he was obligated to provide at his own cost "appropriate substitute coverage for ROU." Furthermore, the Agreement required Cohen to be available to travel as required.

The Agreement also contained an automatic-renewal provision, which stated that the Agreement would be renewed automatically unless the party seeking to terminate gave written notice of termination between six and seven months after the commencement of the anniversary date, or January 1. The termination would become effective the following January 1.

Nine months later, in December 1987, Cohen moved to Tucson, Arizona. He began work under the Agreement on January 1, 1988. In 1988, he performed 550 hours of service for the ROU. The Agreement was renewed effective January 1989 without objection from the ROU. Cohen continued to represent the ROU throughout 1989, performing 1,003 hours of service that year. According to Cohen, legal services rendered for the ROU and related matters "represented well over 50% of my professional time" in 1988 and 1989.

Antagonism existed between Cohen and C.E. DeFries, president of the ROU's parent union, the National Marine Engineers Beneficial Association (NMEBA). Because of this antagonism, Cohen apparently became a liability to Harper in his efforts to become executive secretary of NMEBA. The Dickstein firm, which the Marchi firm had replaced in 1980, represented the NMEBA. On November 16, 1989, Harper, still president of the ROU, sent ballots to the DEC for authorization to renegotiate or terminate Cohen's contract. Those ballots were the first indication that the ROU was not satisfied with Cohen's services.

Sometime after November 16, 1989, Harper asked David Tipton, the auditor for the ROU plans, to analyze Cohen's contract and bills. Tipton claimed that Cohen had double-billed the ROU for hours billed to the plans. Further, he noted that the contract was unclear about credit to the ROU if Cohen did not perform 1,000 hours of work. According to Harper, Tipton's report was the most significant factor in his decision to terminate Cohen's relationship with the ROU. Both the Law Division and the Appellate Division, however, found the claim that Cohen had double-billed the ROU to be a pretext.

By letter dated December 10, 1989, Harper informed Cohen that the trustees of the plans had decided to replace him as co-counsel. On December 28, 1989, Harper sent Cohen a written notification of his termination as general counsel for the ROU, effective three days later, January 1, 1990.

As of the date of termination, Cohen had received full compensation for 1988 and 1989, except for three hours' work over the 1,000-hour limit. In addition, Cohen held $8,079 of the ROU's money in an attorney's special account, not an escrow account. Cohen had received $8,079 on behalf of the ROU as an award of attorney's fees in an arbitration in which the Marchi firm had represented the ROU. Because the ROU already had paid the Marchi firm, Cohen owed the ROU the entire $8,079. Harper and Cohen agreed, however, that Cohen could retain the $8,079 until the end of 1989, and that Cohen would give the ROU credit for that sum against any future additional fees.

After receiving the ROU termination letter, Cohen demanded payment of $100,000, claiming that the Agreement had been automatically renewed for 1990. When the ROU refused, Cohen filed the present action seeking damages of $100,000 for 1990 and $75,000 for reasonably anticipated fees from the ROU Plans and Trusts.

In its answer, the ROU contended that the Agreement was unenforceable for various reasons including Cohen's failure to advise the ROU to seek independent counsel, that certain provisions of the Agreement were unlawful and unreasonably advantageous to Cohen, that the Rules of Professional Conduct barred a suit arising out of the discharge of an attorney, and that the ROU had terminated the Agreement for cause. The ROU also filed a counterclaim for breach of contract, misrepresentation, and malpractice.

After an eight-day trial, the Law Division found that the Agreement was fair and reasonable. Significantly, the court found Cohen to be more credible than Harper. According to the court, the Agreement "was the product of negotiations by both Cohen

and Harper, [that] each side was a capable negotiator, each was aware of their objectives and each exercised some leverage and made some concessions in order to achieve their objectives." The trial court further found "that Harper dumped Cohen in order to appease De Fries and receive De Fries's support for his candidacy to NMEBA."

The court agreed with Cohen's expert on legal ethics, Professor Michael P. Ambrosio of Seton Hall University School of Law, that "the nature of a retainer agreement is primarily to be available, and being available, not being able to take on a full-time position is compensable even if you're never actually called upon to fulfill work." It also found that the notice-of-termination provision was reasonable and fair given the unique facts of this case. In particular, the court noted the need of the University of Arizona to know in June whether Cohen would teach in September. It also found that "[t]he six-month advance notice is not unreasonable when one considers that ... the representation of the ROU required Cohen to travel all over the country to different forums, sometimes on short notice. Thus, having a lawyer at its beck and call, the union cannot argue that it was oppressive or unreasonable that the attorney have a six-month advance notice of the discontinuation of that relationship."

The trial court rejected the ROU's argument based on Rule 1.16(d) of the *Rules of Professional Conduct* (*R.P.C.*), which requires a discharged attorney to refund all fees that are unearned at the time of discharge. The ROU had argued that according to *R.P.C.* 1.16(d) "the right to terminate includes nonliability for contractual fee obligations." The court stated that "Cohen was not a lawyer with an ongoing practice who was discharged by a client. . . . [who] presumably has other clients and is able to easily adapt to the laws of the unearned but anticipated income." Rather, Cohen had relocated to another state, and, "as a result of his engagement by the ROU, he did not pursue a full-time teaching position." Furthermore, the court found that "[t]he necessities of representing ROU prevented him from developing a

significant practice in Arizona" and from pursuing a full-time teaching position.

Notwithstanding its finding that the Agreement was enforceable, the court held that the credit of one hour for every $100 billed to the trust or plans was illegal and unenforceable. That provision, however, was severable and did not affect the enforceability of the entire agreement.

Ruling that Cohen had a duty to mitigate damages, the court awarded him $50,000 for 1990. The court reasoned that by June 1990, Cohen either could have arranged for a full-time teaching position or obtained other clients. It further found that Cohen's failure to place the $8,079 in an escrow account was "clearly inappropriate," but did not constitute misappropriation of the funds. Ultimately, the court calculated that the ROU was entitled to a credit of $37,486 as reimbursement for Cohen's work for the plans. When added to the $8,079, the credit totaled $45,545. Thus, after adding in Cohen's fee of $450 for the three extra hours worked in 1989, the court entered judgment against the ROU in the amount of $4,885. The ROU appealed.

A divided Appellate Division reversed, finding that the Agreement between the ROU and Cohen was unenforceable. 275 *N.J.Super.* at 260–61, 645 *A.*2d 1248. The court reasoned that non-refundable retainer agreements are "not unethical *per se* but are subject always to the overriding precept that any fee arrangement must be reasonable and fair to the client."

According to the Appellate Division, "an attorney is not a businessman 'entitled to charge what the traffic will bear[,]' but rather is entitled to *quantum meruit, i.e.,* 'as much as he reasonably deserved to have for his labor.'" 275 *N.J.Super.* at 253, 645 *A.*2d 1248 (quoting *In re Poli's Estate,* 134 *N.J.Super.* 222, 225, 338 *A.*2d 888 (Mercer County Ct.1975)) (internal citations omitted). Thus, Cohen was entitled to recover for the reasonable value of his services, not the $100,000 specified in the contract. *Id.* at 256, 645 *A.*2d 1248.

The Appellate Division relied on *In the Matter of Cooperman*, 83 *N.Y.*2d 465, 611 *N.Y.S.*2d 465, 466, 633 *N.E.*2d 1069, 1070 (1994), a disciplinary proceeding, which held that fee agreements providing for non-refundable retainers in criminal and probate matters were unenforceable as against public policy. 275 *N.J.Super.* at 253–54, 258, 645 *A.*2d 1248. The court concluded that the Agreement here, like the agreements in *Cooperman*, impermissibly chilled the client's right to discharge the lawyer. *Id.* at 258, 645 *A.*2d 1248.

In reaching that result, the Appellate Division also relied on the "modern rule" pertaining to contingent fee agreements. *Ibid.* Under the "modern rule,"

> If the client has a right to terminate the relationship of the attorney for any reason or without cause, it follows as a corollary that the client cannot be compelled to pay damages for exercising a right which is an implied condition of the contract.... The discharge of the attorney by his client does not constitute a breach of the contract, because it is a term of such contract, implied from the peculiar relationship which the contract calls into existence, that the client may terminate the contract at any time with or without cause.
>
> [275 *N.J.Super.* at 256, 645 *A.*2d 1248 (quoting *Martin v. Camp*, 219 *N.Y.* 170, 114 *N.E.* 46, 48 (1916)).]

The court found the public policy and ethical considerations underlying the modern rule to be equally applicable here. *Id.* at 259, 645 *A.*2d 1248.

Focusing on the unique nature of the attorney-client relationship, the majority declared that a "contract for legal services is not like other contracts," and "ordinary contract principles ... must give way to the higher ethical and professional standards enunciated by our Supreme Court." *Id.* at 259, 645 *A.*2d 1248 (footnote omitted). "To allow Cohen entitlement to $100,000 for 1990 ... after ROU terminated him prior to his rendering of any legal services whatsoever, and knowing he would not be called on by ROU for any such services, is unconscionable and contravenes the essence of our Rules of Professional Conduct." *Id.* at 259–60, 645 *A.*2d 1248. Thus, the majority concluded that "payment to Cohen would run afoul of his obligation to refund promptly any

part of a fee paid in advance that he had not earned. *R.P.C.*
1.16(c)." *Ibid.*

The court reasoned:

we premise our holding on ethical and professional principles and limit it to
invalidating this particular agreement because the six-month notice provision
impermissibly infringed upon the client's inherent right to discharge his attorney,
and provided for the payment of fees even though the attorney failed to render any
legal services whatsoever.

[*Id.* at 258 n. 9, 645 *A.*2d 1248.]

It stressed that "the restrictive termination clause here would
have in effect caused the ROU to continue to retain an attorney it
no longer wanted and create an impermissible chilling effect upon
its inherent right to discharge Cohen at will." *Id.* at 260, 645 *A.*2d
1248. The court continued:

The client's right to terminate at will is not a breach of contract but a contract
term implied by law based upon the special relationship of trust and confidence
between an attorney and client. The right to discharge without cause is of little
value if the client must pay the entire contract price for services not rendered.

[*Id.* at 261, 645 *A.*2d 1248 (footnote omitted).]

Concerning the set-off, the Appellate Division concluded that
Cohen owed the ROU for the $8,079 previously paid to the Marchi
firm. *Id.* at 262–63, 645 *A.*2d 1248. The court rejected any other
set-offs. Consequently, it remanded the matter to the Law Divi-
sion with the direction to enter judgment for the ROU for $8,079,
less the three hours of extra service that Cohen had provided in
1989.

In a concurring opinion, Judge Baime agreed that the Agree-
ment was unenforceable as against public policy, but was unwilling
to limit an attorney's recovery to *quantum meruit* in appropriate
circumstances. He explained that "a lawyer has a legitimate
interest in being compensated for breach of a retainer agreement
and . . . *quantum meruit* may not be enough," and "[i]n appropri-
ate circumstances, out-of-pocket losses and other special damages
may be recovered." *Id.* at 264, 645 *A.*2d 1248.

Judge Villanueva, dissenting in part, agreed with the trial court
that the Agreement, including the notice provision, was fair and

reasonable. *Id.* at 265, 645 *A.*2d 1248. According to Judge Villanueva, lawyers and clients should not be precluded from freely entering into fair and reasonable general retainer agreements that are based on mutual considerations. *Id.* at 269, 645 *A.*2d 1248.

He concluded that Cohen had reduced his fee to less than half the reasonable value of his services. In exchange, the ROU had agreed to a fixed term of employment for Cohen and a provision for advance notice of the ROU's intention not to renew the Agreement. Cohen, moreover, had restricted severely his other legal activities. Consequently, Judge Villanueva believed it was unfair to deny Cohen recovery. *Id.* at 276–77, 645 *A.*2d 1248.

## II

 This Court's exclusive responsibility to regulate the conduct of attorneys, *N.J. Const.* art. VI, § II, ¶ 3, *State v. Rush*, 46 *N.J.* 399, 411, 217 *A.*2d 441 (1966), extends to every aspect of the attorney-client relationship, including agreements for fees. *In re LiVolsi*, 85 *N.J.* 576, 585, 428 *A.*2d 1268 (1981). In discharging that responsibility, we are committed to preserving the fiduciary responsibility that lawyers owe their clients. *See In the Matter of Brown*, 88 *N.J.* 443, 448–49, 443 *A.*2d 675 (1982). We remain especially vigilant when attorneys and clients contract with each other. *R.P.C.* 1.5, 1.8; *In the Matter of Nichols*, 95 *N.J.* 126, 131, 469 *A.*2d 494 (1984); *In the Matter of Gallop*, 85 *N.J.* 317, 322, 426 *A.*2d 509 (1981). To this extent, an attorney's freedom to contract with a client is subject to the constraints of ethical considerations and our supervision. Consequently, courts scrutinize contracts between attorneys and clients to ensure that they are fair. *Nichols, supra*, 95 *N.J.* at 131, 469 *A.*2d 494; *Gallop, supra*, 85 *N.J.* at 322, 426 *A.*2d 509.

 Agreements between attorneys and clients concerning the client-lawyer relationship generally are enforceable, provided the agreements satisfy both the general requirements for contracts and the special requirements of professional ethics. *Re-*

*statement of the Law Governing Lawyers*, § 29A, cmt. c (Proposed Final Draft No. 1 1996) (*Restatement*). An otherwise enforceable agreement between an attorney and client would be invalid if it runs afoul of ethical rules governing that relationship. Consistent with the special considerations inherent in the attorney-client relationship, *In re Education Law Center*, 86 *N.J.* 124, 133, 429 *A.*2d 1051 (1981); *In re Loring*, 73 *N.J.* 282, 289, 374 *A.*2d 466 (1977), the attorney bears the burden of establishing the fairness and reasonableness of the transaction, *Nichols, supra*, 95 *N.J.* at 131, 469 *A.*2d 494; *Gallop, supra*, 85 *N.J.* at 322, 426 *A.*2d 509. A court should construe an agreement between a lawyer and a client "as a reasonable person in the circumstances of the client would have construed it." *Restatement* § 29A cmt. d. Those principles apply as readily to retainer agreements as to other agreements between lawyers and clients.

The *Restatement* explains the reasons for construing agreements between lawyers and clients against the lawyer:

> Three reasons support this rule. First, lawyers almost always write such agreements ... and an agreement traditionally is interpreted against its author. Second, lawyers are more able than most clients to detect and repair omissions in client-lawyer agreements. Third, lawyers have a fiduciary obligation to inform clients about the risks of the representation, including those unresolved by the client-lawyer agreement.

> [*Restatement* § 29A, cmt. h.]

When contracting for a fee, therefore, lawyers must satisfy their fiduciary obligations to the client. The lawyer must explain at the outset the basis and rate of the fee. In addition, the lawyer should advise the client of potential conflicts, the scope of representation, and the implications of the agreement. *Restatement* § 29A, cmt. d. A retainer agreement may not provide for unreasonable fees or for the unreasonable waiver of the clients' rights. *Ibid.*

At issue here are two fundamental considerations: the client's right to discharge a lawyer and the lawyer's right to charge reasonable fees. *See R.P.C.* 1.5 (reasonable fees), 1.16 (terminating the relationship); *Restatement* §§ 29A (Client–Lawyer Agree-

ments), 43 (Termination of Lawyer's Authority), 44 (Discharge by Client and Withdrawal by Lawyer); 46 (Reasonable and Lawful Fees); 50 (Client–Lawyer Fee Agreements); 52 (Fees on Termination). The client's right to hire and fire an attorney is integral to the client-lawyer relationship. *In re Poli's Estate, supra,* 134 *N.J.Super.* at 226–27, 338 *A.*2d 888. "A client may always discharge a lawyer, regardless of cause and regardless of any agreement between them. A client is not forced to entrust matters to an unwanted lawyer." *Restatement* § 44, cmt. b; *see also In re Poli's Estate, supra,* 134 *N.J.Super.* at 226, 338 *A.*2d 888.

▇▇▇▇▇ A retainer agreement may not prevent a client from discharging a lawyer. Neither directly nor indirectly may the agreement restrict a client's right to representation by a lawyer of the client's choice. With a sophisticated client, however, a retainer agreement may provide that the client agrees to compensate the lawyer if the client terminates the relationship, so long as provision does not chill the client's right of termination. *See Restatement* § 52(2)(c).

ROU does not dispute the enforceability of the Agreement under general principles of contract law. It nonetheless asserts that the notice-of-termination provision unlawfully infringes on its right to discharge Cohen as its general counsel. Cohen, however, claims the provision merely assures him of reasonable compensation. He contends further that the ROU agreed to the notice provision in exchange for a reduction in his hourly rate.

▇▇▇ The parties vigorously dispute the circumstances surrounding the formation of the Agreement. According to the trial court, which had the opportunity to observe the witnesses, Cohen was more credible than Harper. We find no reason to depart from the traditional deference that appellate courts accord to a trial court's conclusions on credibility. *Close v. Kordulak Bros.*; 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965). We also defer to the trial court's findings of fact, which we find to be supported by credible evidence. *Rova Farms Resort, Inc. v. Investors Ins. Co. of America,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974).

The trial court found that Harper and the ROU were experienced negotiators and that Harper ably negotiated the Agreement with Cohen. The court further found that both Harper and Cohen understood that the ROU would pay Cohen $100,000 for up to 1,000 hours of work, that the ROU would pay Cohen $150 per hour for each hour in excess of 1,000, and that Cohen was entitled to $100,000, even if he worked less than the anticipated 1,000 hours. Fairly implicit in the arrangement is the ROU's agreement to pay Cohen the retainer for his availability and for not assuming responsibilities that would prevent him from providing timely advice to the ROU. In fact, during 1988, ROU paid Cohen the full $100,000 for only 550 hours of work. The payment of the entire retainer for approximately half the anticipated hours reflects the ROU's understanding that it was paying the retainer for something more than hours worked. ROU confirmed that understanding by renewing Cohen's contract the following year. The trial court also found credible Cohen's testimony that he recommended that the ROU seek independent counsel to review the Agreement. Notwithstanding our acceptance of those findings, the focus of our inquiry is whether the notice-of-termination provision was valid.

The Appellate Division held that the six-month notice-of-termination provision renders the entire Agreement invalid, and that Cohen is entitled to only the reasonable value of services. 275 *N.J.Super.* at 261–62, 645 *A.*2d 1248. In addition to any such award, Judge Baime would add out-of-pocket expenses and special damages.

According to the Appellate Division, the Agreement's requirement of six months notice impermissibly chilled the ROU's right to discharge Cohen. That requirement also improperly saddled the ROU with the substantial penalty of paying Cohen's $100,000 retainer for 1990. 275 *N.J.Super.* at 260–62, 645 *A.*2d 1248.

In reaching that conclusion, the Appellate Division relied substantially on the opinion of the New York Court of Appeals in *Cooperman, supra,* 611 *N.Y.S.*2d at 466, 633 *N.E.*2d at 1070, which involved "non-refundable special retainer agreements." 275

*N.J.Super.* at 253–54, 645 *A.*2d 1248. Under the agreements, Cooperman received "payment of a nonrefundable fee for specific services, in advance and irrespective of whether any professional services are actually rendered." 611 *N.Y.S.*2d at 466, 633 *N.E.*2d at 1070. The local Grievance Committee initiated a disciplinary proceeding charging Cooperman with fifteen charges of misconduct in connection with the fee arrangements. *Ibid.* Holding that the agreements constituted *per se* violations of public policy, the New York Supreme Court, Appellate Division, suspended Cooperman for two years. 187 *A.D.*2d 56, 591 *N.Y.S.*2d 855, 858 (1993).

The Court of Appeals affirmed. 611 *N.Y.S.*2d at 470, 633 *N.E.*2d at 1074. The court's primary concern was to protect the client's "unqualified right to terminate the attorney-client relationship at any time." *Id.* at 468, 633 *N.E.*2d at 1072. According to the court, Cooperman's nonrefundable retainer agreements "diminish the core of the fiduciary relationship by substantially altering and economically chilling the client's unbridled prerogative to walk away from the lawyer" and relegating the client to "hostage status in an unwanted fiduciary relationship—an utter anomaly." 611 *N.Y.S.*2d at 468–69, 633 *N.E.*2d at 1072–73.

*Cooperman* involved unsophisticated, individual clients who signed an attorney's standard-form retainer agreement and paid a nonrefundable lump-sum retainer fee for representation in a particular matter. *Id.* at 466, 633 *N.E.*2d at 1070. The ROU, by comparison, was an experienced client. It agreed to pay Cohen $8,333.33 every month to be its general counsel and provide up to 1,000 hours of legal services per year. In *Cooperman*, the nonrefundable fee unreasonably chilled the clients' right to replace their attorney. Here, in contrast, we cannot say that the fee by itself is unreasonable. Rather, the burden on the ROU's right to discharge Cohen arises because of the combined effect of the provisions for notice and automatic renewal.

Although we do not find *Cooperman* as persuasive as did the Appellate Division, we agree that, under the circumstances of this case, a provision for six months notice of termination is

excessive. The provision excessively burdens the ROU's right to hire and discharge Cohen.

As a matter of public policy, retainer agreements may not limit unreasonably a client's right to discharge an attorney. Some clients, particularly those who regularly retain lawyers, bargain for innovative fee arrangements that limit the right of discharge in exchange for lower fees. In an era of increasing concern about the cost of legal services, it would be counterproductive to preclude clients from bargaining for a reduction in fees in exchange for a reasonable limitation on the right to discharge a lawyer.

The *Restatement* contemplates an "engagement retainer," in which a fee is paid,

> in addition to other compensation, to ensure that a lawyer will be available for the client if required.... An engagement retainer fee satisfies the requirements [that fees be reasonable] if it bears a reasonable relationship to the income the lawyer sacrifices or expense the lawyer incurs by accepting it, including such costs as turning away other clients (for reasons of time or due to conflicts of interest), hiring new associates so as to be able to take the client's matter, keeping up with the relevant field, and the like.
>
> [*Restatement* § 46, cmt. e.]

Section 52 of the *Restatement*, which pertains to Fees on Termination, provides that a lawyer may receive a fee measured by the lower of fair value or the contractual fee. It also recognizes that "fair value" may include "expenses or loss of income ... reasonably incurred by accepting the engagement retainer." *Restatement* § 52, illus. 2. Thus, a retainer agreement setting a reasonable fee may take into account the costs of the lawyer's availability and the opportunities that the lawyer forgoes.

When interpreting agreements between lawyers and their clients, courts may consider the circumstances in which the agreement was made, the parties' past practices and agreements, the extent to which they actually negotiated the agreement, and the client's level of sophistication or experience in retaining and compensating lawyers. *Restatement* § 29A, cmt. h. With retainer agreements, for example, courts may consider whether in-house counsel represented the client in the negotiations or whether the

client entertained competitive bids for its legal work. The extent to which courts will construe an agreement against the attorney is a product of the realities of the attorney-client relationship and the circumstances that give rise to it. *Ibid.* In maintaining the standards of the bar, we need not lower the commercial morality of everyone else.

We are satisfied that the ROU and Cohen intended to provide for a reasonable notice-of-termination provision. The trial court found that the Agreement was the product of hard bargaining between experienced negotiators. Essentially, the ROU agreed to the notice provision in exchange for reduced fees and Cohen's availability on demand. Cohen and Harper had worked together for several years and had established a close professional relationship. Harper's negotiating skills and the DEC's subsequent review of the contract indicate that the ROU appreciated the significance of the notice-of-termination provision.

In effect, the ROU agreed to pay Cohen reasonable compensation for the right to terminate their relationship. So viewed, the notice-of-termination provision furthered the ROU's interest in reducing its legal fees. Furthermore, the ROU realized in 1988 and 1989 that the bulk of Cohen's practice consisted of work for the ROU and the associated plans. Before November 1989, Cohen had no inkling that the ROU was dissatisfied with his performance. Under the circumstances, the three-days' notice of termination that the ROU gave to Cohen is both unfair and unreasonable.

Consistent with considerations of fairness and reasonableness, clients may limit their right to discharge a lawyer by agreeing to give the lawyer reasonable notice of termination of their relationship. Such a limitation may be appropriate when the client is sophisticated or experienced in retaining and compensating lawyers. *See Restatement* § 29A, cmt. h. To withstand judicial scrutiny, the limitation should be fair, reasonable, and not unduly burden the client's right to choose its counsel. *Restatement* §§ 29A, cmt. d; 30(1).

 Ordinarily, when lawyers and clients enter business agreements, the lawyer should advise the client, preferably in writing, to seek independent counsel to review the agreement. *In the Matter of Humen,* 123 *N.J.* 289, 301, 586 *A.2d* 237 (1991); *In the Matter of Smyzer,* 108 *N.J.* 47, 55, 527 *A.2d* 857 (1987). Before entering such agreements, the client should have the opportunity to consult independent counsel. *R.P.C.* 1.8(a). Often, that practice will not be feasible when lawyers and clients sign retainer agreements. If so, the lawyer at least should inform the client of the potential effect of limiting the right to terminate their relationship. *Ibid.*

Some clients are experienced bargainers who can negotiate favorable retainer agreements. Others, particularly individual clients, need the full protection of the fiduciary relationship with their lawyers. Sophisticated clients who bargain with their lawyers from positions of substantial parity are less susceptible to overreaching. For example, in-house counsel may negotiate innovative fee arrangements that are favorable to a corporate client. *See, e.g.,* Dick Dahl, *Share the Pain, Share the Gain,* 82 *A.B.A.J.* 68, 69–70 (June 1996) (discussing incentive fee arrangements).

Even with sophisticated clients, a contractual burden on the right to discharge a lawyer must be reasonable under the circumstances. For example, the client and attorney could agree that the client may terminate the relationship by giving the lawyer reasonable notice. In some circumstances, if a client wishes to exercise its duty to discharge the lawyer immediately, the client may agree to pay the lawyer reasonable compensation for winding down the relationship. The lawyer, however, may not coerce the client into continuing the relationship by a provision that either prohibits the client from discharging the lawyer or requires the client to pay excessive fees if it discharges the lawyer. *See Cooperman, supra,* 611 *N.Y.S.2d* at 466, 633 *N.E.2d* at 1070.

 Under the modern rule, when a client discharges an attorney, the attorney may recover the fair value of his or her services, not damages under the retainer agreement. *Olsen &*

*Brown v. City of Englewood,* 889 *P.*2d 673, 677 (Colo.1995); *AFLAC v. Williams,* 264 *Ga.* 351, 444 *S.E.*2d 314, 353–54 (1994); *LaRocco v. Bakwin,* 108 *Ill.App.*3d 723, 64 *Ill.Dec.* 286, 289–90, 439 *N.E.*2d 537, 540–41 (1982). The rule continues to apply extensively to contingent fee agreements. *Gaines, Gaines & Gaines, P.C. v. Hare, Wynn, Newell & Newton,* 554 *So.*2d 445, 447–49 (Ala.Civ.App.1989); *Fracasse v. Brent,* 6 *Cal.*3d 784, 100 *Cal.Rptr.* 385, 389–90, 494 *P.*2d 9, 13–14 (1972) (in bank); *Rosenberg v. Levin,* 409 *So.*2d 1016, 1019–20 (Fla.1982); *Plaza Shoe Store, Inc. v. Hermel, Inc.,* 636 *S.W.*2d 53, 57–60 (Mo.1982); *Martin v. Camp,* 219 *N.Y.* 170, 114 *N.E.* 46, 48 (1916); *Reid, Johnson, Downes, Andrachik & Webster v. Lansberry,* 68 *Ohio St.*3d 570, 629 *N.E.*2d 431, 434–35 (1994); *Heinzman v. Fine, Fine, Legum & Fine,* 217 *Va.* 958, 234 *S.E.*2d 282, 285 (1977); *see also Simon v. Metoyer,* 383 *So.*2d 1321, 1324 (La.App.1980) (applying modern rule in contingent fee case, but recognizing that under certain circumstances, contract damages are available); *Barr v. Day,* 124 *Wash.*2d 318, 879 *P.*2d 912, 916–18 (1994) (applying modern rule in contingent fee case, but noting substantial performance exception, which prevents client from discharging attorney on eve of settlement to avoid paying contingent fee). Thus, the modern rule permits an attorney to recover the reasonable value of services rendered before discharge. *Olsen & Brown, supra,* 889 *P.*2d at 675; *AFLAC, supra,* 444 *S.E.*2d at 316; *Rosenberg, supra,* 409 *So.*2d at 1019; *Fracasse, supra,* 100 *Cal.Rptr.* 385, 494 *P.*2d at 14. A court may consider the fee specified in the retainer agreement as the basis for determining the reasonable value of the lawyer's services. *See Restatement* § 52 cmt. b ("If the contractual fee was an hourly one and the fee is reasonable, the fair value of the lawyer's services is usually the same as the hourly fee for the number of hours worked." (citations omitted)).

 The modern rule "is premised upon the special confidence and trust existing between an attorney and client which sets the relationship apart from other employment relationships." *Olsen & Brown, supra,* 889 *P.*2d at 675. Under the rule, the client's

right to discharge an attorney is an implicit term of the contract. *Fracasse, supra,* 100 *Cal.Rptr.* 385, 494 *P.*2d at 13. The client's discharge of the attorney, with or without cause, does not constitute a breach of the retainer agreement. *Ibid.; Olsen & Brown, supra,* 889 *P.*2d at 675–76; *AFLAC, supra,* 444 *S.E.*2d at 316–17. By limiting the attorney's recovery for compensation for services rendered, the modern rule balances the "important interests of (1) protecting the special fiduciary nature of the attorney-client relationship and the client's inherent right to discharge and (2) assuring fair and adequate compensation to an attorney." *Olsen & Brown, supra,* 889 *P.*2d at 677.

A minority of courts still apply the traditional "contract rule," in which a client's discharge of an attorney without cause constitutes a breach of contract entitling the attorney to contract damages. *Bockman v. Rorex,* 212 *Ark.* 948, 208 *S.W.*2d 991, 995 (1948); *Tonn v. Reuter,* 6 *Wis.*2d 498, 95 *N.W.*2d 261, 265–66 (1959). Generally, the measure of damages is the full contract price of the fee, although some jurisdictions reduce recovery for services not provided. Other jurisdictions permit the attorney to choose recovery under *quantum meruit* for the fair value of services rendered. *See Rosenberg, supra,* 409 *So.*2d at 1019–20 (discussing traditional rule); V. Woerner, Annotation, *Measure or basis of attorney's recovery on express contract fixing noncontingent fees, where he is discharged without cause or fault on his part,* 54 *A.L.R.*2d 604, 608–15 (1957) (collecting cases and discussing the rule).

Like the Appellate Division, we believe that the modern rule strikes the appropriate balance in the present case. Accordingly, Cohen is entitled to recover in *quantum meruit* for the reasonable value of the services provided. 275 *N.J.Super.* at 261, 645 *A.*2d 1248. We disagree with the Appellate Division, however, that the reasonable value of Cohen's services is limited by the contract fee of $100,000, plus $450 for the three hours worked in excess of 1,000 hours. Like Judge Baime, *supra* at 154, 679 *A.*2d at 1195,

we believe that we need not take so crabbed a view of *quantum meruit.*

The parties intended to provide that the ROU would pay reasonable compensation to Cohen if it terminated their relationship contrary to the terms of their agreement. In effect, the fair value of Cohen's services includes both his annual retainer and the cost of reasonable notice of termination of his representation of the ROU. Numerous facts support the fairness of that conclusion. Harper and the ROU were sophisticated bargainers. They knew that Cohen, for independent economic reasons, needed reasonable notice of termination. Harper, an experienced negotiator, bargained for a reduced hourly rate in exchange for the six-months notice-of-termination. The ROU, nonetheless, gave only three days notice. Under these unusual circumstances, we believe that the fair value of Cohen's legal services includes the cost of reasonable notice of termination.

We conclude that the ROU should compensate Cohen for one month's notice. In ascertaining the value of that notice, we look to the agreed monthly payment of $8,333.33. Substantially for the reasons stated by the Appellate Division, we affirm the ROU's entitlement to a net setoff of $7,629. 275 *N.J.Super.* at 262, 645 *A.*2d 1248. Because of the result we have reached, we need not decide the issue of mitigation of damages.

The judgment of the Appellate Division is modified and affirmed, and the matter is remanded to the Law Division for the entry of a judgment consistent with this opinion.

STEIN, J., concurring in part and dissenting in part.

Reversing the Appellate Division, the Court remands this matter to permit the Law Division to award plaintiff one month's legal fees because of the termination of his contract without adequate notice, although the Court acknowledges that the notice provision in the contract is invalid as contrary to public policy. I disagree. I would hold, as did the Appellate Division, that plaintiff is entitled to no damages because the unreasonableness of the notice provi-

sion renders the contract unenforceable as a matter of law. In that circumstance, allowing the plaintiff to recover compensation for his premature termination is an inappropriate reward to a lawyer who drafted a contract notice provision that unreasonably served to advance his own interests by imposing an unjustifiable restriction on his client's right to terminate his services.

Of course, there may be exceptional circumstances in which an attorney's retention is so valuable to the client and imposes such significant collateral burdens on the attorney that the parties reasonably could agree that the attorney would receive some compensation without providing services if the client terminated the relationship prematurely. This agreement, however, cannot be so characterized, and the trial court's conclusion that the agreement was fair and reasonable is error as a matter of law.

I

The underlying facts simply are insufficient to justify the extraordinary notice of termination provision in the contract.

Cohen, whose New York law firm had represented the Radio–Electronics Officers Union (ROU) (Cohen being the lead partner on the account), decided in 1987 to relocate to Arizona. Cohen and the ROU president discussed the prospect of Cohen, rather than his law firm, serving as counsel to ROU after his relocation. Although the facts are contested, the discussions apparently took into account the union's interest in an hourly rate below the $150 hourly rate paid to Cohen's law firm and Cohen's interest in advance notice of termination of his representation to permit Cohen to apply for a full-time position at Arizona Law School. According to Cohen, that Law School made hiring decisions in June of each year.

Cohen prepared the contract retaining him as ROU's counsel, testifying at trial that he advised Thomas Harper, ROU's president, to consult with independent counsel. Harper testified that Cohen presented him with the contract and demanded that he sign it, without mentioning the need to consult another lawyer.

The agreement provided for annual compensation of $100,000 for 1000 hours service payable in monthly installments of $8333.33, and compensation of $150 hourly for all services performed beyond 1000 hours in any year. The parties apparently understood that Cohen would receive $100,000 even if he provided less than 1000 hours of service. Thus, Cohen was paid $100,000 for 550 hours of services in 1988 (an effective hourly rate of about $200), and $100,000 for 1003 hours in 1989. In addition, ROU agreed to attempt to have Cohen designated as co-counsel for all "ROU related Plans and Trusts." Cohen apparently was hired by some of the ROU Plans and Trusts, and was paid $107,000 in 1989 for that legal work, at the rate of $225 hourly.

The contract's renewal clause provided that the contract automatically would renew each year unless either party provided "written notice of termination on a date in any year not less than six (6) months nor more than seven (7) months after the commencement anniversary date of this agreement which notice shall, unless withdrawn, become effective on the next anniversary date." Stated simply, ROU could discharge Cohen only by notice in the month of June, to take effect on the ensuing January 1st.

Other relevant provisions required Cohen to be available during ROU's regular business hours for consultation by phone within twenty-four hours of a call from ROU to Cohen, and "emergency" calls required Cohen to be available within three hours. If Cohen were justifiably unavailable at any time, he was obligated to provide appropriate substitute coverage for ROU.

On December 28, 1989, ROU informed Cohen that his position as general counsel would terminate on January 1, 1990. After ROU refused Cohen's demand for payment of $100,000 representing his anticipated fees for 1990, Cohen instituted this suit.

## II

The fundamental principle that dictates the outcome of this appeal is that a client ordinarily possesses the right to discharge an attorney at any time with or without cause. *See In re Estate of*

*Poli,* 134 *N.J.Super.* 222, 225–27, 338 *A.*2d 888 (Mercer County Ct.1975); *Restatement of the Law Governing Lawyers* § 44 cmt. b (Tentative Draft Nos. 5–6 1993); *RPC* 1.16 official ABA cmt. ("A client has a right to discharge a lawyer at any time, with or without cause...."); *cf. RPC* 1.16(a)(3) ("[A] lawyer ... shall withdraw from the representation if ... the lawyer is discharged."). The client's right to discharge its attorney is a basic tenet of the relationship between attorneys and clients, distinguishing that relationship from ordinary commercial contracts. In *In re Estate of Poli, supra,* the County Court quoted with approval the Supreme Court of California's statement of the basic rule:

> [A] client should have both the power and the right at any time to discharge his attorney with or without cause. Such a discharge does not constitute a breach of contract for the reason that it is a basic term of the contract, implied by law into it by reason of the special relationship between the contracting parties, that the client may terminate the contract at will. It would be anomalous and unjust to hold the client liable in damages for exercising that basic implied right.
>
> [134 *N.J.Super.* at 225–26, 338 *A.*2d 888 (quoting *Fracasse v. Brent,* 6 *Cal.*3d 784, 100 *Cal.Rptr.* 385, 389, 494 *P.*2d 9, 13 (1972)).]

The basic right of a client to discharge an attorney at any time and without cause has led to the so-called "modern rule" that limits the compensation of an attorney discharged from a contingent-fee contract to the reasonable value of services already performed, without any right to recover additional compensation based on the breach of contract. The New York Court of Appeals explained the rationale for the modern rule in *Martin v. Camp,* 219 *N.Y.* 170, 114 *N.E.* 46 (1916):

> That the client may at any time for any reason or without any reason discharge his attorney is a firmly established rule which springs from the personal and confidential nature of the relation which such a contract of employment calls into existence. If the client has the right to terminate the relationship of attorney and client at any time without cause, it follows as a corollary that the client cannot be compelled to pay damages for exercising a right which is an implied condition of the contract. If in such a case the client can be compelled to pay damages to his attorney for the breach of the contract, the contract under which a client employs an attorney would not differ from the ordinary contract of employment. In such a case the attorney may recover the reasonable value of the services which he has rendered, but he cannot recover for damages for the breach of contract. The discharge of the attorney by his client does not constitute a breach of the contract, because it is a term of such contract, implied from the peculiar relationship which

the contract calls into existence, that the client may terminate the contract at any time with or without cause.

[*Id.* 114 *N.E.* at 48 (citation omitted).]

A majority of courts throughout the country follow the modern rule, those courts invariably attributing their unwillingness to allow damages for the attorney's premature discharge to the fundamental principle that a client ordinarily possesses the unconditional right to discharge an attorney, thereby precluding the discharge from constituting a breach of contract. *See, e.g., Gaines, Gaines & Gaines, P.C. v. Hare, Wynn, Newell & Newton,* 554 *So.*2d 445, 447–48 (Ala.Civ.App.1989); *Fracasse v. Brent, supra,* 100 *Cal.Rptr.* 385, 494 *P.*2d at 13; *Olsen & Brown v. City of Englewood,* 889 *P.*2d 673, 675–77 (Colo.1995); *Cole v. Myers,* 128 *Conn.* 223, 21 *A.*2d 396, 399–400 (1941); *AFLAC, Inc. v. Williams,* 264 *Ga.* 351, 444 *S.E.*2d 314, 316–17 (1994); *Rosenberg v. Levin,* 409 *So.*2d 1016, 1021 (Fla.1982); *Anastos v. Chicago Regional Trucking Ass'n,* 250 *Ill.App.*3d 300, 188 *Ill.Dec.* 479, 481, 618 *N.E.*2d 1049, 1051 (1993), *appeal denied,* 154 *Ill.*2d 557, 197 *Ill.Dec.* 483, 631 *N.E.*2d 705 (1994); *LaRocco v. Bakwin,* 108 *Ill.App.*3d 723, 64 *Ill.Dec.* 286, 290, 439 *N.E.*2d 537, 541 (1982); *Simon v. Metoyer,* 383 *So.*2d 1321, 1324 (La.Ct.App.), *writ denied,* 389 *So.*2d 1338 (La.1980); *Smith v. Binder,* 20 *Mass.App.Ct.* 21, 477 *N.E.*2d 606, 608 (1985); *Martin v. Camp, supra,* 114 *N.E.* at 48; *Baker v. Zikas,* 176 *Neb.* 290, 125 *N.W.*2d 715, 718 (1964); *Adkin Plumbing & Heating Supply Co. v. Harwell,* 135 *N.H.* 465, 606 *A.*2d 802, 804 (1992); *Reid, Johnson, Downes, Andrachik & Webster v. Lansberry,* 68 *Ohio St.*3d 570, 629 *N.E.*2d 431, 435–36 (1994); *Heinzman v. Fine, Fine, Legum & Fine,* 217 *Va.* 958, 234 *S.E.*2d 282, 286 (1977); *Barr v. Day,* 124 *Wash.*2d 318, 879 *P.*2d 912, 917 (1994); *Committee On Legal Ethics of the W. Va. State Bar v. Cometti,* 189 *W.Va.* 262, 430 *S.E.*2d 320 (1993). See Judy B. Sloan, *Quantum Meruit: Residual Equity in Law,* 42 *DePaul L.Rev.* 399, 439–46 (1992).

## III

The Court concedes that the notice-of-termination clause in Cohen's contract unreasonably limited ROU's right to discharge

him. "The provision excessively burdens the ROU's right to hire and discharge Cohen." *Ante* at 160, 679 *A*.2d at 1197. Nevertheless, the Court infers that the parties intended that Cohen would be paid reasonable compensation if he were prematurely discharged, and remands the matter to the Law Division to award Cohen one month's compensation as "the cost of reasonable notice of termination of his representation." *Id.* at 164–165, 679 *A*.2d at 1200.

In my view, the Court is too generous in its characterization of the unreasonable aspect of the termination notice, and confers an unwarranted benefit on Cohen by reforming the contract to substitute a reasonable notice provision for one that was extraordinarily unreasonable and unfair.

The contract's notice provision permitted ROU to terminate Cohen only in the month of June in each year, failing which the contract would automatically renew. Even if ROU had provided Cohen with a termination notice in June of 1989, the earliest effective date of Cohen's termination would have been January 1, 1990, requiring ROU to pay Cohen $50,000 for no legal services if they intended to replace him immediately. If, however, ROU decided to discharge Cohen at any time after June of 1989, his contract entitled him to be fully compensated until January 1, 1991, potentially entitling Cohen to as much as eighteen-months compensation even though his client wished to discharge him immediately.

On its face, the termination clause is outrageously unfair, all the more so because Cohen prepared it and his client was unrepresented. Cohen argues that it was justifiable because the University of Arizona Law School, where he was interested in teaching as an alternative to representing ROU, made its hiring decisions in June. However, he offered no proof that after termination by ROU he applied for a position to teach at the Law School. Other than foregoing the opportunity to *apply* to teach at the Law School, Cohen offered no other substantial justification for the extraordinary notice-of-termination requirement. Cohen notes his obli-

gation to be available to ROU at all times, but offered no proof that that obligation caused him to lose existing clients or prevented him from developing new clients. Cohen also relies on his reduced hourly rate of $100 per hour to justify the termination provision. However, in 1988 Cohen was paid $100,000 for approximately 500 hours of legal services, a rate of about $200 per hour. In addition, in 1989 Cohen was paid $107,000 by the "ROU related Plans and Trusts," at the rate of $225 per hour. All told, Cohen received over $300,000 from ROU and the Plans and Trusts for services rendered in 1988 and 1989, and presumably rendered services for and received compensation from other clients during that period. In that context, the notice-of-termination clause that Cohen drafted cannot conceivably be regarded as anything other than an attempt by Cohen to favor unduly his own interest at the expense of his client, by unreasonably restricting ROU's fundamental right to discharge him at any time.

The Court agrees that the notice-of-termination clause is contrary to public policy. *Ante* at 159, 679 *A*.2d at 1197. Moreover, the Court agrees with the Appellate Division that Cohen should be permitted to recover in quantum meruit only for the reasonable value of the services he provided. *Ante* at 164, 679 *A*.2d at 1200. Inexplicably, the Court then rewrites the contract by defining the reasonable value of Cohen's services to include the cost of reasonable notice of termination, which the Court arbitrarily establishes to be $8,333.33, constituting one month's compensation under Cohen's terminated contract.

In effect, the Court has transformed an utterly unreasonable notice-of-termination clause violative of public policy into a reasonable one-month termination clause, adopting without acknowledgement the technique used for enforcing restrictive covenants in employment contracts only to the extent that they are reasonable under the circumstances. See *Karlin v. Weinberg*, 77 *N.J.* 408, 418–20, 390 *A*.2d 1161 (1978). That analogy, however, is inappropriate as a basis for modifying the terms of a contract for legal services that violates public policy. In *Jacob v. Norris, McLaugh-*

*lin & Marcus,* 128 *N.J.* 10, 607 *A.*2d 142 (1992), this Court pointedly rejected such an approach. "The more lenient test used to determine the enforceability of a restrictive covenant in a commercial setting, *see Solari Indus. v. Malady,* 55 *N.J.* 571, 576, 264 *A.*2d 53 (1970), is not appropriate in the legal context." *Id.* at 27, 607 *A.*2d 142. Accordingly, we held in *Jacob* that the provisions of a law firm's "Service Termination Agreement" that withheld termination compensation only from those firm members who within one year of termination represented clients of the firm or solicited employees of the firm to engage in law practice violated *RPC* 5.6 and were therefore unenforceable as contrary to public policy. *See id.* at 22–32, 607 *A.*2d 142.

The Court should adhere to the wisdom of its approach in *Jacob.* A lawyer that takes unfair advantage of a client by drafting a retainer agreement with terms so unreasonable as to violate public policy disserves the profession. This Court's non-delegable responsibility over the practice of law dictates our obligation to deny enforcement of such agreements, signaling our strong disapproval of any attempt by a lawyer to disadvantage a client unfairly. The Court's unprecedented reformation of this agreement rewards a lawyer who selfishly put his own interest before his obligation to his client.

I imply no disapproval of agreements that reasonably take into account the unfair consequences of a client's premature discharge of a lawyer. In many circumstances, provision for a non-refundable retainer or for compensation to cover expenses or losses necessarily incurred because of a lawyer-client relationship may be fair and reasonable. I conclude only that the notice of termination provision at issue here cannot be so characterized.

I would affirm the judgment of the Appellate Division.

Justice COLEMAN joins in this opinion.

*For modification, affirmance and remandment*—Justices HANDLER, POLLOCK, O'HERN and GARIBALDI—4.

*For affirmance*—Justices STEIN and COLEMAN—2.