773 A.2d 1176 (2001)
340 N.J. Super. 104
STARKEY, KELLY, BLANEY & WHITE, Plaintiff-Respondent/Cross-Appellant,
v.
ESTATE OF Nancy NICOLAYSEN, Lisa Gelburd and Sigurd Nicolaysen, Jr., Defendants-Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued March 14, 2001.
Decided April 30, 2001.
*1177 Joseph E. Murray, Berkeley Heights, argued the cause for appellants/cross-respondents (Jay B. Bohn, on the brief).
Scott W. Kenneally, Toms River, argued the cause for pro se respondent/cross-appellant (Charles E. Starkey, of counsel; Mr. Kenneally, on the brief).
Before Judges BAIME, CARCHMAN and LINTNER.
The opinion of the court was delivered by CARCHMAN, J.A.D.
This appeal requires us to consider whether an attorney who has failed to secure a timely written contingent fee agreement may recover either a contingent fee or an award based on quantum meruit, or is barred from any fee recovery. Here, plaintiff law firm Starkey, Kelly, Blaney & White and its clients, Nancy and Sigurd Nicolaysen (decedents), agreed on a contingent fee but did not reduce their agreement to writing for a period exceeding two years after the commencement of representation. Judge Arnold concluded that the belated execution of the contingent fee agreement was a violation of RPC 1.5(b) which barred recovery of a contingent fee, but reserved plaintiff's right to seek quantum meruit relief. Following a subsequent trial on that issue, Judge Hoens concluded that quantum meruit relief was warranted and granted an award. Decedents' heirs, defendants Lisa Gelburd and Sigurd Nicolaysen, Jr. (Sandy), and the Estate of Nancy Nicolaysen appealed, and plaintiff cross-appealed. We hold that *1178 under the circumstances presented here, plaintiff was barred from a contingent fee award but was entitled to quantum meruit relief. We affirm the award and dismiss the cross-appeal.

I
These are the undisputed facts. On April 5, 1984, in contemplation of their retirement and their children's futures, decedents entered into a contract to sell their 113 acre Montgomery Township farm to Chaim Melcer for the sum of $870,000, at $7,700 per acre, contingent upon Melcer's ability to obtain preliminary subdivision approval and access to all required utilities within twelve months (Melcer contract). Eight months later, on January 30, 1985, Melcer assigned the contract to a builder, Henry Opatut (Opatut contract), who sought to extend the time frame for required utilities approvals.
Decedents were worried by and dissatisfied with the price terms, Opatut's proposed performance extension, and their then-attorney's recent poor press. So, in early 1985, on the recommendation of a mutual acquaintance, decedents retained Charles E. Starkey, a partner in plaintiff, to represent them in the matter and advise them on the farm sale. Starkey believed that decedents had not received a fair price from Melcer, advised them to terminate the sale agreement upon Opatut's failure to meet his performance contingencies, and over the course of nine more years and during the remainder of their lifetime provided extensive legal services to decedents with respect to the farm. As decedents lacked the resources to pay for Starkey's services on an hourly basis, they agreed over the course of several subsequent meetings that Starkey would represent them on a contingent fee basis for one-third of the difference between the Melcer/Opatut contract sale price of $870,000 and any sale price should he succeed in extricating them from the contract:
Now, from the beginning of my personal meeting with [decedents], they were concerned about how they would pay the fee because they didn't have any money. That was the reason they were trying to sell the property in the first place. Early on, I don't know whether it was theI doubt whether it was the first meeting, the first meeting I probably said we'll work that out, but certainly within the next month or so we discussed how they could pay the fee.
They flat out told me they couldn't afford an hourly basis. I said that's okay. What we would do is handle it on a contingent fee basis. I told them that the closest thing on a contingent fee basis that I was familiar with would be a condemnation action, and I told them that the normal approach in a condemnation action if you represent the condemnee is that you get a percentage, usually one-third, of the excess over what the offer in condemnation was.
Starkey thereafter not only successfully represented decedents in terminating the Mercer/Opatut contract by defending against consolidated suits for specific performance at a three-day trial and on subsequent appeal, but also simultaneously represented decedents in their continued negotiations with other developers for the sale of their land.
On December 23, 1986, while the Melcer/Opatut litigation was still pending before this court, decedents entered into a contract of sale with Newman and Newman Builders and Developers, Inc. in the amount of $3,996,000, at the rate of $36,000 per acre, contingent upon decedents' success on the Melcer/Opatut appeal (Newman contract). Pursuant to the Newman contract, decedents received a $50,000 deposit from Newman within four months of *1179 its signing, and additional incremental deposits of $10,000 per month thereafter, for a sum total of $200,000. This sum was determined to be non-refundable.
Due to Mrs. Nicolaysen's concern over the prospect of continuing litigation, Mr. Nicolaysen's failing health, and "that so much time had gone by before any money was paid," she wanted to formalize "some method of paying" Starkey for his services, and Starkey obliged on November 10, 1987, not only by reducing their oral contingent fee agreement to writing, but also by unilaterally reducing his typical percentage fee to 20% of the sale price differential. This adjustment was made in light of the Newman contract, which would have yielded a fee of $625,200 at that rate upon closing. That letter agreement, which decedents signed and returned to plaintiff on November 13, 1987, over two and one-half years after commencement of Starkey's representation, provided:
While our case before the Appellate Division is still awaiting final decision, I thought that we should make an effort to reduce to writing our arrangement for establishing legal fees for our past and future services.
During our initial meetings you will recall that I discussed handling this case on a basis similar to a real estate condemnation matter. In those types of cases, the normal approach is to base a legal fee on the spread between the amount offered by the condemning authority and the amount finally obtained for the client as a result of the negotiations and/or litigation. Typically, that type of contingent fee is in the amount of one-third of the monies obtained for the client.
In your situation and because of what I have always regarded as the great disparity between your contract price with Opatut and what I thought would be the real worth of your property, I indicated to you that one-third would be an excessive fee. Accordingly, our fee proposal is to perform all services, including a Supreme Court Appeal if that becomes necessary, for a fee based on twenty percent of the difference between the present acre price in the Opatut contract and the present acre price realized by you from the Newman contract or any other contract which is ultimately closed by you. No money would be due us if we were unsuccessful in obtaining a price higher than that offered by Opatut and, in any event, payments would be due us only as received by you. For example, if you received part of the purchase price at closing and took back a mortgage for the balance, we would be entitled to receive our percentage fee only on the money when it comes into your hands.
Out-of-pocket expenses for filing fees, depositions and the like, as in the past, would be billed to you as they are incurred.
If the above accurately reflects our understandings as to a fee, I would appreciate it if you could acknowledge by signing a copy of the letter which I have enclosed. If you have any questions, please do not hesitate to call.
Sandy was apprised of this agreement and its terms directly by decedents at the time of its execution, and it was his understanding that his parents "did not have the money to pay the fees and that [his] mother was concerned that so much time had gone by before any money was paid" to Starkey.
Four months later, in March, 1988, Newman requested an extension for its faltering performance of the contract terms related to down payments and obtaining sewage disposal services and approval, and decedents again elected to terminate the *1180 contract. Starkey again successfully represented decedents both at trial and on appeal in defending against Newman's suit for specific performance and decedents' return of the $200,000, and he continued to assist decedents in their efforts both to secure another buyer and to obtain regional sewer service for their property. Decedents then "suggested that [plaintiff] should start collecting a fee out of [the non-refunded $200,000 deposit]." Although Starkey regularly accepted decedents' payments of costs pursuant to their agreement, he declined their offer to begin collecting his fee from the Newman deposits.
Mr. Nicolaysen died in October 1992. In the spring of 1993, Mrs. Nicolaysen entered into a contract of sale with Calton Homes which apparently fell through. After Mrs. Nicolaysen's death July 1994, Starkey obliged Sandy's request to review another developer's proposal to purchase the property for $1,000,000 cash. Starkey's subsequent attempts to ascertain defendants' intent with respect to the contingent fee agreement were met with silence.
After receiving no response to Starkey's inquiries regarding fees, on June 3, 1996, plaintiff filed a complaint seeking compensation for the legal services performed for decedents by enforcement of the agreement or under the equitable doctrines of quantum meruit or unjust enrichment. Defendants, by answer, admitted that plaintiff had been retained by decedents and not paid for its services, and asserted various separate defenses, including plaintiff's failure to comply with the conditions precedent of R. 1:20A-6 (requiring preaction notice of client's right to request fee-arbitration) and N.J.S.A. 2A:13-6 (barring action for fees until a bill has been sent to client) and failure of the farm sale contingency. In response, on August 8, 1996, plaintiff sent defendants an un-itemized bill for attorneys' fees in the amount of $625,200 along with an itemized accounting of costs which had previously been paid by the Nicolaysens and a fee-arbitration notice.
Plaintiff, having satisfied the conditions precedent, then amended its complaint to seek the additional relief of a declaratory judgment that the fee agreement was valid and to remain in full force and effect until all provisions were fulfilled. Defendants then claimed that plaintiff's fee agreement violated both defendants' absolute right to terminate plaintiff's services and various RPC provisions.
On November 29, 1996, defendants individually and as executors of the estate entered into a contract of sale with Toll Brothers, Inc. for $2,000,000 cash. That agreement was subsequently terminated by Toll Brothers on January 3, 1997 for reasons not specified in the record. However, according to defendants, the property has "failed numerous percolation tests and is not serviced by any public or private sanitary sewer system," and "[p]rior purchasers have not been able to obtain satisfactory percs or public sewer access to develop the property." Defendants claim that the property has not been sold and is not presently under contract for sale.

II

A.
The parties cross-moved for summary judgment. Judge Arnold, relying on Estate of Pinter v. McGee, 293 N.J.Super. 119, 679 A.2d 728 (App.Div.1996) and Glick v. Barclays De Zoete Wedd, Inc., 300 N.J.Super. 299, 692 A.2d 1004 (App.Div. 1997), held that plaintiff's failure to comply with RPC 1.5(b) by not reducing the fee agreement to writing within a reasonable period of time after commencing representation *1181 rendered the contract unenforceable:
In their papers ... plaintiff simply argues that the contingent fee agreement was eventually reduced to writing and that therefore plaintiffs complied with RPC 1.5(b). But frankly, we have got a two and a half to three year gap here ... between the commencement of the representation to the formulation of a ... written agreement. And that doesn't seem like a reasonable time after commencing representation. As set forth in the rule.
....
This court holds that plaintiffs failed to comply with RPC 1.5(b).
Having determined that, the next step is to consider the effect of such failure on the enforceability of the contingent fee agreement. Unfortunately for the plaintiff's position, the failure to adhere to the Rules of Court and professional responsibility does result in a party being unable to enforce the purported fee arrangement. [citing Pinter, supra, 293 N.J.Super. 119, 679 A.2d 728; Glick, supra, 300 N.J.Super. 299, 692 A.2d 1004].
These cases all establish that there is a higher standard of conduct which is applied to the attorney/client relationship, and that ordinary principles of contract law may have to give way to that higher standard of conduct as set forth in [Cohen v. Radio-Electronics Officers Union, District 3, 275 N.J.Super. 241, 259, 645 A.2d 1248 (App.Div.1994), modified by 146 N.J. 140, 679 A.2d 1188 (1996) ]. There the Court said: "In light of the unique and special relationships between an attorney and a client, ordinary contract principles governing the agreements between parties must give way to higher ethical and professional standards enunciated by our Supreme Court. A contract for legal services is not like other contracts."
In light of all these considerations, this court holds that the failure to comply with the requirements of RPC 1.5(b) results in the contingent fee agreement being unenforceable.
He concluded that even if it were otherwise enforceable, the condition precedent of a sale triggering defendant's duty to perform had not yet occurred, and rejected plaintiff's assertion that the equitable lien on applicable sale proceeds which would have arisen by virtue of plaintiff's services could be translated into a lien on the property itself absent evidence of the parties' intent to that effect, finding the proposed remedy "extraordinary," and not called for under the "facts of this case." Finally, as to quantum meruit, the judge held that under Glick, supra, those damages would be recoverable, but only if and when the land was sold, consistent with the clear intent of the parties as evidenced by the agreement. Ultimately, an order was entered denying relief under the contingent fee agreement, but noting that "[t]he parties may try the issue of quantum meruit damages but no judgment establishing a lien may be entered until the property is sold at a price greater than the Opatut contract price or $7,700 per acre."

B.
The parties tried the issue of quantum meruit before Judge Hoens. Defendants presented no witnesses at trial, while Starkey and two associates described the fee agreement and services rendered. Their statements concerning the circumstances of plaintiff's extensive undertaking on the Nicolaysens' behalf were specific and illuminating. According to Starkey, decedents were not "business savvy," and were very worried at the outset by their inability *1182 to pay his feehe did not wish to compound their concerns:
[they] were veryat one point scared and nervous, and very nice people. I met with them probably more than I would meet with other types of clients. The problem they had was interesting from a legal standpoint, and it was tragic from a personal standpoint. And they were just nice people, so I wasn't in a hurry to finalize an arrangement as I might be if it was someone like some other clients that we have.
Starkey met or spoke with decedents often during the course of the Melcer/Opatut litigation, and particularly around the time of trial in preparing Mr. Nicolaysen because he was nervous and not a very good witness, requiring more preparation than the average client.
Due to their contingent fee agreement, Starkey and plaintiff's associates maintained no time records with respect to their undertakings on decedents' behalf between February 1985 and October 1993. They estimated their hours of service based upon recollections and the remnants of decedents' incomplete client files.
Starkey's candid, detailed testimony and affidavit of services evidenced that during that period he spent approximately 641 hours performing a variety of services related to decedents' contract actions and attempts to sell the farm, including: numerous correspondences and consultations with decedents, real estate brokers, prospective purchasers' attorneys, and prior and opposing attorneys; extensive research and preparation for decedents' two contract actions, each involving pleadings, memoranda, briefs, witness preparation, oral and written discovery, pre-trial motions, three-day trials, and appeals with oral argument; research, travel, and consultations with state and local agencies concerning local sewer service plans and engineering and feasibility studies; meetings with prospective buyers, investors, and joint venturers, including extensive negotiations on the Newman contract; and extensive negotiations and evaluation of numerous purchase inquiries and offers both prior to and following execution of the Newman contract. Plaintiff's two associates who also worked on several aspects of decedents' causes over the years, Natalie Pouch and Anthony Mancuso, were equally candid and detailed in their testimony and estimated their hours spent in drafting various documents on decedents' behalf by examining the complexity of the documents and extrapolating billable hours accordingly.
Starkey also testified that although his current hourly rate is approximately $225 per hour, his rate during the period from 1985 to 1993 would have been "closer to 150 than 225," and "could have been" as low as $125 depending on a number of variables including the nature of the case, the client, and the client's ability to pay. He could not recall whether he advised decedents of his hourly fee, but did recall that they said they could not afford to pay him by the hour. He also stated that a firm associate's billing rate would have been approximately $75 per hour between the years of 1985 and 1990.
On August 11, 1999, Judge Hoens issued a comprehensive written decision in which she declined to vacate that portion of Judge Arnold's order permitting plaintiff's quantum meruit claim to proceed, concluding:
The simple fact is that both Starkey and [decedents] agreed that Starkey would be paid, that he would be compensated for his efforts on their behalf. Indeed there were two contingencies in that agreement, namely, that he succeed in terminating the Melcer-Opatut contract (which he did) and that the property be *1183 sold for a higher price than the original Melcer-Opatut contract would have gained for [decedents]. There is no question but that the parties agreed on a method for fixing the fee (namely 20% of the price differential) and upon a time for payment (namely the sale of the property), both of which were designed to meet [decedents'] needs given that they lacked the available funds to proceed with the litigation otherwise. There is equally no doubt but that these parties would not be in court on this matter were the [decedents] still alive, for the parties never varied in their understanding that Mr. Starkey was entitled to compensation for his work on their behalf. The fact that Judge Arnold held that the contingent fee agreement itself was unenforceable does not deprive this plaintiff of any remedy, as Judge Arnold recognized.
Judge Hoens examined plaintiff's proofs as to defendants' unjust enrichment as an essential element of plaintiff's quantum meruit claim, and found:
There can be no clearer case of the propriety of permitting an award in quantum meruit in the face of the failure of the contingent fee agreement than the one before this court. The suggestion that these defendants did not obtain the benefit of Mr. Starkey's efforts is wholly without merit, focusing as it does on the fact that the heirs, for reasons nowhere explained, unilaterally decided not to sell the property. The suggestion made on their behalf that the focus of the efforts of Mr. Starkey was to secure a sale of the land and that the failure to do so equates with no benefit secured for them by virtue of his labor is simply misplaced. In point of fact it is entirely undisputed that Mr. Starkey was retained primarily to extricate [decedents] from the original Melcer-Opatut contract, a goal which he achieved after the considerable effort involved in discovery, trial and an appeal. The relationship between his compensation and the sale of the land was indirect. First, he knew that [decedents] did not have readily available funds with which to pay him and were planning to sell the property to support themselves in their retirement and agreed as a result to await the sale in order to secure payment for his services. Second, however, he agreed to assist them in that sale and to accept a unified fee for all of his services, relating to the contract litigation and to the sale, to be calculated on the difference in sales prices, similar to a structure for fees he had utilized in condemnation litigation. Thereafter, when the second, Newman contract was executed, he unilaterally reduced his fee based on the significant disparity in price between the two contracts, an agreement and a calculation method he was willing to abide by in spite of the fact that he thereafter pursued added and unanticipated litigation through another trial and another appeal arising out of that contract at the behest of the [decedents].
In this context, however, the [decedents] plainly benefitted from Mr. Starkey's efforts. But for his skill and dedication, the property would have been lost to Melcer and Opatut for a fraction of its true value. But for his skill and dedication, the Newman contract litigation would have resulted in a judgment against the [decedents] forcing them to repay to Newman $200,000 he had paid to them and on which they had lived for a significant period of time. The efforts of Starkey just as plainly benefitted the heirs to the estate themselves. Sigurd Nicolaysen Jr. was given three acres of the parcel during the pendency of the litigation on which he desired to build a home, which parcel would not have been *1184 available at all had Melcer and Opatut prevailed and which would have been burdened by a part of the $200,000 demanded by Newman had he succeeded. And both of the heirs, through Mr. Starkey's efforts, inherited the entire parcel, to do with as they please, but which would have been lost to them had his efforts on their parents' behalf not succeeded. There is simply no evidence that Mr. Starkey's efforts have not in fact enriched these defendants. In this context, while it is true that the second contingency of the agreement Mr. Starkey made, namely the sale of the property at a price higher than the Melcer Opatut contract, has not taken place, that contingency was and is solely within the control of the heirs. There is no evidence before this Court to demonstrate that the land is not marketable or that its value is any less than Newman was willing to pay in 1988, as a result of which the failure of the sale contingency is not a risk Mr. Starkey should bear. While the sale might retain validity as a precondition for payment of the fee, the theory of quantum meruit permits the court to fix the fee independently of the eventual sales price of the property. And there is nothing inconsistent with the concept of contingent fees in this result. Here, an integral part of the agreement of the [decedents] was that the property would be sold, as they needed to generate funds for their own support and independently of the need to pay Mr. Starkey's fee. There is no evidence offered by the heirs to suggest that Mr. Starkey would have agreed to such a contingency had the [decedents] not intended to sell the property at all. As a result, unlike the contingent fee decisions cited by defendants, there is no alteration of the terms of the agreement by Mr. Starkey, there is merely an effort to fix the fee to which the [decedents] at all times conceded he was absolutely entitled.
The judge then applied the methodology for fixing the fee as mandated in Szczepanski v. Newcomb Medical Center, 141 N.J. 346, 367, 661 A.2d 1232 (1995), requiring meticulous scrutiny of reconstructed time summaries in the absence of contemporaneous time records to verify their reasonableness and to exclude any "marginal" charges or entries. She analyzed plaintiff's records "in light of the Court's own knowledge and understanding of the proceedings and the time of the attorneys involved, whether completely documented or not."
Based upon the Szczepanski standard, and her independent review of plaintiff's records and the testimony presented, the judge concluded:
First, the attorneys in question at all times believed that the matter would be handled as a contingent fee matter as a result of which they did not maintain complete contemporaneous time records. Second, the files they maintained and produced are plainly not complete, as there were undoubtedly drafts of pleadings and briefs in addition to those which have survived which are not retained in the files and there were, equally without question, numerous conferences and telephone communications which are no longer reflected in the files which have survived. Under the circumstances, however, the absence of those documents needed for a very precise calculation, however, is entirely understandable and should not work to the disadvantage of the attorney.
Significantly, comparing the descriptions of work Mr. Starkey recalls performing (which recollections are consistent with the objectively reviewable data in the files and time diaries) with the time estimates Mr. Starkey calculated, *1185 the resulting hourly estimates are rather modest. Looking for example at the entry for September 1986, with a total of 55 hours of his time, and taking into account that the tasks performed in that month include both preparation for and appearances at oral argument of cross motions for summary judgment and at a three day trial, the total estimated number of hours simply cannot be challenged. Similarly, the entries for the month including the trial of the Newman matter in August 1989, totaling 24 hours are equally in accord with the objectively reviewable evidence. Overall, regarding time estimates, while defendants raise some issues with regard to the lack of precision, they do not and cannot seriously contest any of the time estimates of Mr. Starkey or of his associates. Nor does this Court's independent review of the materials available give the Court any ground to diminish the claims as it respects hours of effort on the part of the attorneys. In light of this finding, it is abundantly clear that Mr. Starkey himself worked a total of 640.5 hours, comprised of 147.25 hours in 1985, 148.5 in 1986, 56 hours in 1987, 96 hours in 1988, 162.5 hours in 1989, 24 hours in 1990 and 6.25 hours in 1993. There is as well, uncontradicted testimony that his associates, Ms. Pouch and Mr. Mancuso devoted significant time to the [decedents'] matters, although the proofs regarding their time is inconsistent. Based upon this Court's analysis of the tasks performed, the contents of the files which are reflective of those tasks, and their candid testimony in Court on the subject of their estimates of time, it is clear that the reasonable estimate of the hours for Ms. Pouch and Mr. Mancuso is a total of 25 hours and 75 hours, respectively, devoted to the matters undertaken by the firm on behalf of the [decedents].
With respect to fixing appropriate hourly rates to be applied to plaintiff's time expended on behalf of decedents, the judge concluded that the value of plaintiff's services "must be fixed based upon prevailing rates Mr. Starkey charged at the time the services were performed," and considered a rate for Starkey of $150 per hour for one period of the representation and $200 per hour for another, and a rate of $75 per hour which increased to $125 per hour for the associates. Based on her findings of time and rate, she awarded a total fee of $115,712.50 "in favor of plaintiff and against all defendants, jointly and severally, rather than to be recorded as a lien solely against the property."

III
Defendants contend that Judge Hoens erred in granting quantum meruit relief to plaintiff because: (1) such relief cannot be awarded for legal services performed under a fee agreement rendered unenforceable for failure to comply with RPC 1.5; (2) such relief is not available where the unenforceable agreement contingency has not yet occurred; (3) "the [judge's] fact findings and conclusions that benefits were bestowed to justify quantum meruit relief were incorrect as a matter of law;" (4) the judge applied inappropriate standards in determining the amount of quantum meruit awarded; and (5) "the quantum meruit judgment against the estate and its heirs jointly and severally should be a special judgment, only as to the heirs." Plaintiff contends on cross-appeal that Judge Arnold erred as a matter of law in holding the fee agreement unenforceable.
We first address our standard of review and observe that despite some questions of defendant's intentions regarding subsequent attempts to sell the property, a factual issue that focuses primarily on remedy, the underlying facts determined *1186 by the trial judge are not in significant dispute. Only the legal consequences flowing therefrom are at issue. In such cases, our standard of review suggests no special deference to the trial judge's interpretation of the law and application of facts to relevant and applicable legal precepts. See Manalapan Realty v. Township Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995); LaSala v. LaSala, 335 N.J.Super. 1, 2, 760 A.2d 1122 (App.Div. 2000). However, to the extent that we must consider the judge's findings of fact, they are binding if supported by sufficient credible evidence in the record as a whole. Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974); In re Will of Liebl, 260 N.J.Super. 519, 523, 617 A.2d 266 (App.Div.1992), certif. denied, 133 N.J. 432, 627 A.2d 1138 (1993).
Even though raised by way of cross-appeal, an appropriate and logical first step in the analysis of the issues in dispute is to determine the enforcement of the underlying contingent fee agreement. The thrust of Judge Arnold's decision was that the fee agreement was not executed within a reasonable time and, as such, failed to comply with RPC 1.5(b) and was therefore unenforceable. Two provisions of RPC 1.5 are relevant here. The first, RPC 1.5(c) provides that
[a] fee may be contingent on the outcome of the matter for which the service is rendered.... A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated.
See also R. 1:21-7(b) (requiring advising a client of the "opportunity to retain the attorney under an arrangement for compensation on the basis of the reasonable value of the services" before entering into a contingent fee arrangement). The second relevant provision is RPC 1:5(b), which provides that a lawyer who has not regularly represented a client must communicate the basis or rate of his or her fee in writing to the client "before or within a reasonable time after commencing the representation." It is this latter provision that anchored Judge Arnold's legal conclusion.
The parties do not dispute that decedents were strangers to Starkey, that a written fee agreement was therefore required, and that the written agreement was not produced until November 13, 1987, some thirty-three months after plaintiff undertook decedents' representation. However, plaintiff contends that the period of time between its commencement of decedents' representation in February 1985, and its presentation of the November 13, 1987 written fee agreement was "reasonable" under RPC 1.5(b) because although Starkey normally charged 33 1/3% of his clients' added recovery attributable to his services in condemnation cases, he believed that percentage "would possibly be too high and would need to be reduced" in decedents' case. He reasoned that he had no objective basis upon which to set the reduced fee until the Newman contract was executed.
We disagree. We first observe that the purpose of the obligation to present a written fee agreement is to memorialize the agreement as to quantum of the fee. The possibility of a future fee adjustment is certainly an issue that can be addressed in the initial fee document as well as after execution of the document. To suggest that no agreement could be reached until *1187 execution of the Newman contract exposes the dangers of failure to have an executed fee agreement in place in the first instance. While Starkey's gratuitous and admirable reduction of the percentage of recovery in light of the Newman contract resulted in a benefit to the client here, the purpose of a promptly written fee agreement is nevertheless subverted by such a delay. Although no one questions Starkey's commitment to his clients or his good-faith dealing in this case, one could easily envision a less principled attorney negotiating the fee agreement after a four million dollar contract had been proposed and suggesting a substantial fee that might not have been readily anticipated. Such a circumstance is too fraught with the potential of mischief and detriment to a client to be sanctioned.
Even if we accepted Starkey's contention that plaintiff could not set the percentage fee prior to decedents' execution of the Newman contract on December 23, 1986, plaintiff offers no explanation as to why an additional eleven months passed between execution of that contract and its presentation of a written fee agreement to decedents. The record supports the conclusion that the agreement was finally reduced to writing only because Mrs. Nicolaysen had grown increasingly uncomfortable by the passage of time without a writing and insisted that plaintiff produce one. We agree with Judge Arnold that the "reasonable time" for producing a written contingent fee agreement as required by RPC 1.5(b) had long passed when the agreement here was in fact produced. Cf. Cohen v. Radio-Electronics Officers Union, Dist. 3, 146 N.J. 140, 156, 679 A.2d 1188 (1996) ("A court should construe an agreement between a lawyer and a client `as a reasonable person in the circumstances of the client would have construed it.'") (quoting Restatement of Law Governing Lawyers § 29A comment d (Proposed Final Draft No. 1, 1996)).
We observe that RPC 1.5(b) provides for execution of a contingent fee agreement "within a reasonable time after commencing the representation." We need not define the outer limits of "reasonable time" nor describe those circumstances which are envisioned by the rule. We must be mindful of the admonition from the Court that fee agreements between lawyer and client will be construed against the lawyer, Cohen, supra, 146 N.J. at 156, 679 A.2d 1188, a rule based on sound policy foundations. The preparation of the agreement is part of the representational process and the timing of its preparation, and in some cases execution, rests exclusively with the attorney. In this case, Mrs. Nicolaysen pursued the issue of compensation, perhaps more so than counsel. Her insistence finally produced the agreement in question. These are factors which become particularly relevant in an assessment of what constitutes "reasonable time." We conclude that the delay in preparation and execution of the fee agreement of approximately two and one-half years after the commencement of representation was not a reasonable time and violated RPC 1.5(b).
In determining that an agreement executed years after the commencement of representation is unreasonable, we have little concern that we have too narrowly construed "reasonable time." Certainly, there are circumstances precluding execution of the agreement before representation, and RPC 1.5(b) recognizes such circumstances. This is not one of them. We ascribe no malevolence to plaintiff's motives for late execution, but as we have noted, the late execution of the contingent fee agreement violated RPC 1.5(b). Judge Arnold correctly concluded that the agreement was unenforceable. See Vaccaro v. *1188 Estate of Gorovoy, 303 N.J.Super. 201, 207, 696 A.2d 724 (App.Div.1997) (noting that attorneys cannot benefit from their failure to comply with the requirements of RPC 1.5 by enforcing an agreement which violates that rule).
We now address the implications of such violation and the issues raised by defendants' appeal. Defendants assert that plaintiff may not recover on a theory of quantum meruit for services rendered under the unenforceable contingent fee agreement because: (1) Pinter dictates a contrary result; (2) "quantum meruit relief should not be available as a means of indirectly recovering what an attorney cannot directly recover;" and (3) "[w]e are all members of a profession that should not be given deference on this issue, but held at least to the same public interest protection given to clients of real estate brokers."
Our decisions prior and subsequent to Pinter plainly undermine defendants' suggested rule that there can be no recovery where there is no proper written contingent fee agreement. See, e.g., Vaccaro, supra, 303 N.J.Super. at 203, 696 A.2d 724 ("`Pinter does not overrule the years of precedent that allow an attorney the right to recover the reasonable value of services under a quantum meruit theory when that attorney has been discharged in the midst of performing services pursuant to a contingency fee agreement.'"); Glick, supra, 300 N.J.Super. at 313, 692 A.2d 1004 (rejecting Pinter's denial of all compensation as "too harsh a result" where an attorney was retained and rendered services in good faith, but failed to obtain a written fee agreement pursuant to R. 1:21-7 or RPC 1.5(c)); Pinter, supra, 293 N.J.Super. at 128, 679 A.2d 728 (Shebell, J., concurring in the result) (noting that failure to comply with R. 1:21-7 should only bar the award of a contingent fee, "but not a reasonable fee based on the services actually rendered"); In re Estate of Travarelli, 283 N.J.Super. 431, 436-38, 440, 662 A.2d 572 (App.Div.1995) (allowing recovery of quantum meruit despite law firm's violations of R. 1:21-7 and RPC s 1.5(b) and (c) by failing to reduce contingent fee agreement to writing); La Mantia v. Durst, 234 N.J.Super. 534, 544, 561 A.2d 275 (App. Div.), certif. denied, 118 N.J. 181, 570 A.2d 950 (1989) (recognizing that absent a written contingent fee agreement for a client's tort action, a law firm would normally only be entitled to quantum meruit for its services in successfully settling the case).
In Glick, supra, we questioned the result in Pinter, and examined the doctrine of quantum meruit in detail within the context of fee-splitting between two law firms where the preceding firm did not have a valid contingency agreement with the client and the case was ultimately settled by the succeeding firm:
Quantum meruit is a form of quasi-contract, permitting recovery of as much as is deserved. Where an attorney performs legal services for another at his request, but without any [enforceable] agreement or understanding as to the remuneration, the law implies a promise [by] the party who requested such services to pay a just and reasonable compensation. Thus, to prevail, the dismissed attorney must demonstrate that the former client would be unjustly enriched by the receipt and retention of a benefit without compensation, where the attorney, in conferring the benefit, expected to be paid.
Because the proper measure of compensation under quantum meruit is as much as is deserved, the crucial factor in determining the amount of recovery is the contribution which the lawyer made to advancing the client's cause. Thus, if a retiring lawyer cedes to his successor *1189 a substantially prepared case which resulted from an extensive investment of time, skill, and funds, the retiring lawyer might be entitled to compensation greater than the standard hourly rate. In comparison, if a ceding lawyer's work contributed to a recovery by the client, but the new attorney was crucial in the success of the case, then the predecessor's compensation should be based, at most, upon a standard hourly rate. Finally, if the predecessor's work, no matter how extensive, contributed little or nothing to the case, then the ceding lawyer should receive little or no compensation. Where the attorney is discharged for good cause, he or she may not be entitled to any recovery, except reimbursement of the reasonable costs incurred in the representation.

[300 N.J.Super. at 310-11, 692 A.2d 1004 (citations omitted).]
In Vaccaro, supra, we again recently questioned Pinter, and held that plaintiff's failure to enter into a written contingent fee agreement pursuant to RPC 1.5 would not preclude recovery in quantum meruit for plaintiffs' six-year effort to secure a zoning change on behalf of their client for a percentage of the land's increased value:
[U]nder the "modern" rule the absence of a written retainer does not require giving defendants a windfall at the expense of their attorneys, if the zoning application was ultimately granted with the benefit of the plaintiff's work product.
....
"If a client and lawyer have not made a valid agreement providing for another measure of compensation, a client owes a lawyer who has performed legal services for the client the fair value of the lawyer's services."
... [W]here a retainer agreement is unenforceable "because it is a contingent-fee agreement but is not in writing as a court rule requires[,][q]uantum-meruit recovery then provides compensation in circumstances in which it would be contrary to the parties' expectation to deprive the lawyer of all compensation."

[303 N.J.Super. at 207, 696 A.2d 724 (quoting Restatement, supra, § 51 and comment (i)).]
We conclude that under the facts presented here, where all parties agree there was an oral fee agreement in place which was ultimately memorialized, albeit too late to be enforced according to its terms, denial of any recovery would be too harsh a remedy and a quantum meruit recovery may be awarded to plaintiff for the reasonable value of legal services rendered.
Defendants also assert that there can be no recovery of fees in quantum meruit because under the terms of the contingent fee agreement, the obligation to pay did not arise until the property was soldthat is, the contingency was never met. There is no dispute that plaintiff performed legal services on behalf of decedents. The flaw in defendants' contention is that they seek to disavow the contingent fee agreement as unenforceable while relying on the terms of the contingency itself in seeking to disavow quantum meruit relief. See Fracasse v. Brent, 6 Cal. 3d 784, 100 Cal.Rptr. 385, 494 P.2d 9, 23 (1972) (Sullivan, J., dissenting) ("By thus selectively retaining parts of the contract, even though it has been disaffirmed, the majority violate the rule that the contract must be preserved or eliminated in its entirety.").
While defendants correctly point out that the various cases cited all involve circumstances where the contingency has been met and a pool of money is available for distribution, here plaintiff performed and benefitted defendants even if no sale *1190 was actually consummated. Moreover, even if plaintiff's performance were to be measured under the void agreement, its obligations were actually two-fold, as noted by Judge Hoens, with its primary obligation being to extricate decedents from the Melcer/Opatut contract no matter what the litigation cost. Plaintiff not only succeeded in that litigation, but also subsequently succeeded both in extricating decedents from the Newman contract and in negotiating additional purchase offers at no added fee to decedents despite Mrs. Nicolaysen's express desire to begin compensating plaintiff for its services before the farm was sold. As noted by Judge (now Justice) Long, the crucial factor in determining the amount of a quantum meruit recovery of attorney's fees "is the contribution which the lawyer made to advancing the client's cause." Glick, supra, 300 N.J.Super. at 311, 692 A.2d 1004. Judge Hoens correctly concluded that plaintiff fully "advanced" decedents' cause in those two complex contract negotiation and litigation matters (one of which netted $200,000 to decedents). "The parties never varied in their understanding that Mr. Starkey was entitled to compensation for his work on [decedents'] behalf."
We recognize that while there is no sale of the property, there is the potential that the property could be sold for less than $870,000, which was the original contract price and the impetus for Starkey's retention in the first instance. Defendants suggest an anomalous result if a fee were ordered and a sale resulted in an unfavorable price of less than the $870,000 figure. We need not resolve that issue here because there are no credible proofs to suggest that the property is worth less than that amount. In fact, the various contracts described to the trial judge all involved sums substantially in excess of that amount. Even the Toll Brothers' contract was for $1,000,000 cash, which has a present-day value which may exceed an installment transaction in excess of such contract price.
Ultimately, we recognize that quantum meruit recovery sounds in quasi-contract, but it is also governed by equitable principles, see Kopin v. Orange Products, Inc. 297 N.J.Super. 353, 373, 688 A.2d 130 (App.Div.), certif. denied, 149 N.J. 409, 694 A.2d 194 (1997) (noting that quantum meruit is "a legal remedy, albeit one based on equitable principles"). Under different factual circumstances, where credible proofs evidenced a value below that contemplated by the parties, a judge could fashion an appropriate remedy to recognize such circumstances. We are of the view that absent such proofs, the quantum meruit recovery here need not be altered to reflect what we perceive to be the unlikely eventuality of the property being sold in a bona fide sale at less than $870,000. We conclude that Judge Hoens correctly determined that plaintiff was entitled to compensation despite the absence of a sale of the property.
To the extent defendants contend that Judge Hoens' factual determinations were erroneous, we are satisfied the argument is without merit, R. 2:11-3(e)(1)(A), (E). The record, without question, supports both her analysis of the reconstructed records, see Szczepanski, supra, 141 N.J. at 367, 661 A.2d 1232, and her factual determinations as to the quantum and quality of plaintiff's representation. Rova Farms Resort, supra, 65 N.J. at 484, 323 A.2d 495; In re Will of Liebl, supra, 260 N.J.Super. at 523, 617 A.2d 266.
Finally, we reject defendant's contention that the estate rather than the heirs should be liable for any judgment entered on behalf of plaintiff. The heirs now retain the property unburdened by *1191 the contractual obligations which prompted plaintiff's representation in the first place.
Affirmed.